# United States Court of Appeals
# for the Federal Circuit

———————————

**WELLS FARGO & COMPANY AND SUBSIDIARIES,**
*Plaintiff-Appellant,*

v.

**UNITED STATES,**
*Defendant-Appellee.*

———————————

2010-5108

———————————

Appeal from the United States Court of Federal Claims in case no. 06-CV-628, Judge Thomas C. Wheeler.

———————————

Decided: April 15, 2011

———————————

DAVID FARRINGTON ABBOTT, Mayer Brown, LLP, of New York, New York, argued for plaintiff-appellant. With him on the brief were BRIAN W. KITTLE; and STEPHEN M. SHAPIRO, JOEL V. WILLIAMSON, THOMAS C. DURHAM, TIMOTHY S. BISHOP and MICHAEL R. EMERSON, of Chicago, Illinois.

CORY A. JOHNSON, Trial Attorney, Commercial Litigation Branch, Tax Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. On the brief were JOHN A. DICICCO, Acting

Assistant Attorney General, RICHARD FARBER and JUDITH A. HAGLEY, Attorneys.

———————————————

Before NEWMAN, BRYSON, and LINN, *Circuit Judges.*

BRYSON, *Circuit Judge.*

This case requires us to evaluate the federal income tax consequences of sale-in, lease-out ("SILO") transactions. The Court of Federal Claims denied Wells Fargo $115 million in claimed deductions for tax year 2002 stemming from its participation in 26 SILO transactions with tax-exempt entities. We affirm.

I

A sale-in, lease-out transaction of the sort at issue in this case consists of two concurrent leases of an asset owned by a tax-exempt entity. In the first lease, known as the "head lease," the tax-exempt entity leases the asset to the taxpayer for a lease term that exceeds the useful life of the asset. Because the asset will be returned to the tax-exempt entity only after its useful life has expired, the IRS treats the head lease as a sale of the asset. In the second lease, known as the "sublease," the taxpayer leases the asset back to the tax-exempt entity for a term that is less than the asset's remaining useful life. The sublease is a net lease, meaning that the tax-exempt entity is responsible for all expenses normally associated with ownership of the asset. The tax-exempt entity also retains legal title to the asset.

The taxpayer prepays the entire "rent" of the head lease in one lump sum. The taxpayer funds the rent prepayment in part with its own funds and in part with a nonrecourse loan. The portion of the rent prepayment

funded by the taxpayer's own funds is known as the "equity portion," and the portion funded through borrowing is known as the "debt portion." The tax-exempt entity receives a small percentage of the head lease rent prepayment, usually between 4 percent and 8 percent of the asset value, as its fee for participation in the SILO transaction. The remainder of the rent prepayment, minus transaction costs, is placed in two restricted accounts, one for the equity portion and one for the debt portion. Each account is nominally held by the tax-exempt entity, but the funds are controlled by an affiliate of the taxpayer's nonrecourse lender.

The debt portion account is used to make the tax-exempt entity's sublease rental payments. Money never actually changes hands during a rental payment; the lender's affiliate simply moves funds from the tax-exempt entity's debt portion account to the lender's account in an amount sufficient to service the taxpayer's nonrecourse loan debt. The debt portion account has sufficient funds to cover the tax-exempt entity's payments for the life of the sublease or, equivalently, the taxpayer's payments for the life of its nonrecourse loan. Because of the circular nature of the debt payments, the funds in the debt portion account are known as "loop debt." The taxpayer's debt is effectively "defeased," or extinguished, meaning that dedicated funds exist for the purpose of paying off the debt. The taxpayer can therefore ignore its nonrecourse loan debt for purposes of its balance sheet.

The lender's affiliate invests the equity portion account in high-grade debt, such as government bonds. The growth of the account is managed so that the tax-exempt entity has sufficient funds to repurchase its asset from the taxpayer at the conclusion of the sublease. The repurchase price, or "exercise price," is set at the begin-

ning of the SILO transaction. The tax-exempt entity can exercise its option to repurchase the asset simply by giving notice to the taxpayer. If the option is exercised, the funds in the equity portion account are transferred to the taxpayer, and a final payment of loop debt is made from the debt portion account to the taxpayer's nonrecourse lender. The debt portion account is emptied and the debt of the taxpayer to the lender is satisfied. The net result is the same as if the taxpayer had simply invested its equity portion account in high-grade debt, receiving a predictable return on that investment over the life of the sublease.

If the tax-exempt entity chooses not to exercise its repurchase option, the taxpayer generally has two choices. The taxpayer can elect either the "return option," under which the taxpayer takes control of the asset immediately, or the "service contract option," under which the taxpayer postpones taking control of the asset. Under the "service contract option," the tax-exempt entity is required to satisfy several conditions before continuing to use the asset or arranging for its use by a third party. Those conditions are described below. Under either option, the tax-exempt entity ultimately receives the balance of the funds in the two accounts.

SILOs offer three tax benefits to the taxpayer. First, as owner of the asset for tax purposes based on the head lease, the taxpayer may take depreciation deductions on the asset for the remainder of its useful life. *See* 26 U.S.C. ("I.R.C.") § 167(a). Second, the taxpayer may take deductions for interest payments made from the tax-exempt entity's debt portion account to service the taxpayer's nonrecourse loan. *See* I.R.C. § 163(a). Third, the taxpayer may deduct certain transaction costs associated with the SILO. If the tax-exempt entity exercises its

repurchase option, these tax benefits are partially offset at the end of the sublease by taxes owed on the taxpayer's receipt of funds from the equity portion account. Even taking those taxes into account, however, the deferral of tax payments during the life of the sublease has substantial economic value to the taxpayer.

SILOs evolved in response to a long-running battle among Congress, the IRS, and enterprising taxpayers regarding the boundaries of permissible leasing of tax-exempt property to generate tax benefits. In 1981, Congress enacted "safe-harbor leasing rules" that allowed taxpayers to lease property from tax-exempt entities. Economic Recovery Tax Act, Pub. L. No. 97-34, 95 Stat. 172 (1981). The safe-harbor rules, however, were quickly repealed in 1982. Tax Equity and Fiscal Responsibility Act, Pub. L. No. 97-248, 96 Stat. 324 (1982). In 1984, Congress enacted the so-called "Pickle Rule," which provided that property leased from a tax-exempt entity would be depreciated at a slower rate than other property in order to limit the tax benefits generated by such transactions. Deficit Reduction Act, Pub. L. No. 98-369, 98 Stat. 494 (1984).

Taxpayers then began to employ creative strategies to avoid the Pickle Rule and receive greater tax benefits from the property of tax-exempt entities. One of those strategies was the use of lease-in, lease-out ("LILO") transactions. A LILO is like a SILO, except that the head lease term is shorter than the asset's remaining economically useful life, so the IRS treats it as a lease rather than a sale. The end-of-lease options are also different for LILOs if the tax-exempt entity does not exercise its repurchase option: At the taxpayer's discretion, the tax-exempt entity may be required to return the assets, renew its lease, or lease the assets to a third party. *See* Rev.

Rul. 02-69, 2002-2 C.B. 760.  Like the SILO options, each of the end-of-lease options in a LILO is structured to effectively eliminate risk of loss to the taxpayer.  *See BB&T Corp. v. United States*, 523 F.3d 461, 464-65 (4th Cir. 2008).  The Federal Transit Administration ("FTA") has at various times promoted LILO and SILO leases as a means of providing infusions of cash for financially troubled public transit agencies.

The LILO market came to an end beginning in 1999, when the Treasury Department issued new regulations requiring that prepayment of the head lease rent be treated as a loan for tax purposes.  *See* Treas. Reg. § 1.467-4.  At that point, taxpayers were "[p]resumptively alerted that the IRS would challenge exotic efforts to transfer tax deductions from tax indifferent entities." *AWG Leasing Trust v. United States*, 592 F. Supp. 2d 953, 959 (N.D. Ohio 2008).  In 2002, the IRS clarified that LILO transactions did not satisfy the substance-over-form doctrine, discussed below.  Rev. Rul. 02-69.  Taxpayers then began using SILOs instead of LILOs in order to avoid the new regulations on leases by characterizing the head lease as a sale.  In addition, taxpayers asserted that the term of a service contract was not subject to the Pickle Rule for determining the applicable rate of depreciation.  Finally, in 2004, Congress put an end to tax benefits generated from both LILO and SILO transactions by amending the Internal Revenue Code.  American Jobs Creation Act, Pub. L. No. 108-357, 118 Stat. 1418 (2004); *see* I.R.S. Notice 05-13, 2005-1 C.B. 630.  While the amendments were prospective in effect, they were not designed to alter the general principles of tax law that apply in determining the legitimacy of transactions designed to generate tax deductions.  *See* H.R. Rep. No. 108-755, at 660 (2004) (Conf. Rep.).

## II

From 1997 to 2003, Wells Fargo entered into several SILO transactions with tax-exempt entities. For tax year 2002, Wells Fargo claimed $115 million in deductions based on 26 SILO transactions. Seventeen of the transactions were with domestic transit agencies, and nine were with owners of qualified technological equipment ("QTE"). When the IRS denied the deductions, Wells Fargo paid the disputed amount and filed a refund suit in the Court of Federal Claims. Before trial, the parties agreed to let the court's disposition of five representative SILO transactions guide the resolution of the entire claim. Four of these representative transactions involved domestic transit agencies, including New Jersey Transit ("NJT"), Caltrans, Houston Metro, and the Washington Metropolitan Area Transit Authority ("WMATA"). The final representative transaction was a QTE transaction involving two lots of cellular telecommunications equipment owned by Belgacom Mobile ("Belgacom"), a Belgian company.

The four transit agency transactions were typical SILO transactions. The assets in each case were public transit vehicles: light-rail vehicles (NJT), locomotives and passenger rail cars (Caltrans), buses (Houston Metro), and subway cars (WMATA). Each transit agency had the option to repurchase the assets at a fixed price at the end of the sublease term. In each case, the length of the combined sublease and service contract term was no more than 80 percent of the equipment's remaining economically useful life, meaning that if the transit agency chose not to exercise its repurchase option, the equipment would be returned to Wells Fargo with useful life remaining. Due to the length of the sublease terms, it is not known at this time whether the tax-exempt entities will exercise their repurchase options.

To provide for the possibility that the repurchase option might not be exercised, each of the four transit SILOs included a service contract option. The length of the service contracts varied from seven to fourteen years. Wells Fargo did not have to inform a transit agency whether it would impose a service contract until less than one year prior to termination of the sublease. If Wells Fargo chose to exercise the service contract option, the transit agency would need to locate a third-party operator for the equipment and negotiate an operating agreement with that third party. The agency would also be required to refinance the outstanding debt from the debt portion account, procure and pay for insurance to cover the residual value of assets, maintain the equipment in newly refurbished condition, and arrange for payment of periodic fees to Wells Fargo sufficient to preserve its economic return on investment. If Wells Fargo chose to exercise the return option instead of the service contract option, the transit agency would receive the balance of the debt portion and equity portion accounts in exchange for giving the equipment to Wells Fargo in newly refurbished condition.

The end-of-sublease options were somewhat different for the Belgacom QTE transaction. Instead of having the option to repurchase the equipment at the conclusion of the sublease, Belgacom was given an "early buyout option" a few years before the end of the sublease. Under the early buyout option, Belgacom could repurchase the equipment from Wells Fargo for an amount equivalent to the balance of the equity portion account at the time the option was executed. The Belgacom SILO did not include a service contract option. Instead, if Belgacom did not exercise its repurchase option, it would need to repurchase the equipment at the conclusion of the sublease, renew the sublease for a series of one-year terms, or

return the equipment to Wells Fargo.   Upon return to Wells Fargo, the telecommunications equipment would need to be in "as new" condition, including any relevant hardware and software updates, and Belgacom would be required to pay for any installation of the equipment as directed by Wells Fargo.   In 2007 and 2008, Belgacom terminated its SILOs for the two lots of equipment by exercising its early buyout option.   During the sublease period, Belgacom claimed tax ownership and depreciation deductions for the QTE under Belgian law.

Following a four-week bench trial addressing the five representative SILO transactions, the Court of Federal Claims denied Wells Fargo's claim in its entirety.   The court found that Wells Fargo participated in SILO transactions only when it had sufficient "tax capacity" to use the tax benefits of the transactions.   The court further found that Wells Fargo expected the tax-exempt entities to exercise their options to repurchase their assets because "the economic effects of the alternatives were so onerous and detrimental that a rational tax-exempt entity would do nothing other than exercise the options."   In any event, the court concluded, the service contract option in the transit agency subleases protected Wells Fargo from residual value risk during the assets' remaining useful lives.   Analyzing the economic effect of the transactions, the court found that, other than the tax advantages, Wells Fargo received no net economic benefit from entering into the SILO transactions.   In addition, the court found that the SILO transactions had no effect on the tax-exempt entities' use of the assets, that no funds changed hands during the sublease period,[1] that the assets were ap-

---

[1]    In the Belgacom SILO, Wells Fargo was provided with a small return on the equity portion account during the sublease period.

praised at an inflated value in order to maximize depreciation deductions, and that there were no arms-length negotiations of any of the lease terms. In summary, the court determined that each of the representative SILO transactions "essentially amount[ed] to Wells Fargo's purchase of tax benefits for a fee from a tax-exempt entity that cannot use the deductions." Accordingly, the court held that the transactions were abusive tax shelters and that the claimed tax benefits from those transactions should be disallowed. In so ruling, the court found that transactions had to be disregarded for tax purposes under both the "substance-over-form" doctrine and the "economic substance" doctrine.

On appeal, Wells Fargo argues that the trial court (1) employed an inappropriate methodology to determine that Wells Fargo lacked the benefits and burdens of ownership in the assets that were the subject of the SILO transactions; (2) used the wrong test to measure its pretax profit; and (3) misapplied the "nontax business purpose" test. The first argument is directed to the "substance-over-form" doctrine. The remaining arguments relate to the "economic substance" doctrine. We review the characterization of transactions for tax purposes de novo, based on underlying findings of fact, which we review for clear error. *Stobie Creek Invs., LLC v. United States*, 608 F.3d 1366, 1375 (Fed. Cir. 2010); *see Frank Lyon Co. v. United States*, 435 U.S. 561, 581 n.16 (1978).

III

Judicial anti-abuse doctrines "prevent taxpayers from subverting the legislative purpose of the tax code." *Coltec Indus., Inc. v. United States*, 454 F.3d 1340, 1354 (Fed. Cir. 2006). The substance-over-form doctrine provides that the tax consequences of a transaction are determined

based on the underlying substance of the transaction rather than its legal form. *See Griffiths v. Helvering*, 308 U.S. 355, 357 (1939) (looking to "the crux" of transaction by imagining it in its simplest form); *Minn. Tea Co. v. United States*, 302 U.S. 609, 613 (1938) ("A given result at the end of a straight path is not made a different result because reached following a devious path."); *Holiday Vill. Shopping Ctr. v. United States*, 773 F.2d 276, 280 (Fed. Cir. 1985).

In order to be entitled to deductions for depreciation of assets and associated interest and transaction expenses, Wells Fargo had to show that it owned the SILO equipment. *See Coltec*, 454 F.3d at 1355. Ownership for tax purposes is not determined by legal title. Instead, in order to qualify as an "owner" for tax purposes, the taxpayer must bear the benefits and burdens of property ownership. *Frank Lyon*, 435 U.S. at 572-73; *Corliss v. Bowers*, 281 U.S. 376, 378 (1930). Here, the parties agree that the clearest indicator of ownership is the allocation of risk associated with the value of the leased assets.

Wells Fargo argues that it acquired the benefits and burdens of ownership in the leased assets because there was a possibility that it would regain possession of the leased assets at a time when they still retained some economically useful life. Wells Fargo notes that the sublease term, even when added to the period of a subsequent service contract, would still leave Wells Fargo with economically useful assets, and that it would be subject to financial risk based on the actual value remaining in those assets after the SILO transaction ended. Wells Fargo's argument is predicated on uncertainty regarding whether the tax-exempt entities would exercise their options to repurchase the assets. The trial court noted that for tax purposes Wells Fargo required the tax-

exempt entities to state that at the time of closing they had not made any determination whether they would exercise their repurchase options. However, based on evidence including statements made by the tax-exempt entities at the time, the trial court found that "[t]he evidence . . . strongly supports a conclusion that the [repurchase options] would almost certainly be exercised to terminate the transactions." At oral argument, counsel for Wells Fargo acknowledged that affirmance would be appropriate if that finding were to stand.

We have never held that the likelihood of a particular outcome in a business transaction must be absolutely certain before determining whether the transaction constitutes an abuse of the tax system. The appropriate inquiry is whether a prudent investor in the taxpayer's position would have reasonably expected that outcome. Characterization of a tax transaction based on a highly probable outcome may be appropriate, particularly where the structure of the transaction is designed to strongly discourage alternative outcomes. *See Knetsch v. United States*, 364 U.S. 361, 366 n.3 (1960) (disregarding "wholly unlikely assumption" regarding taxpayer's future behavior in the course of concluding that transaction lacked substance); *Stobie Creek*, 608 F.3d at 1378 (evaluating substance of transaction based in part on the "structure of the investment," which eliminated any "reasonable possibility" of nontax profit); *cf. Frank Lyon v. United States*, 435 U.S. 561, 577 (1978) (finding taxpayer to have incurred risk in transaction where there was "substantial risk" of loss, "not just the abstract possibility that something will go wrong").

Seeking to undermine the trial court's finding that the tax-exempt entities were highly likely to exercise the repurchase options, Wells Fargo challenges the testimony

of Dr. Thomas Lys, the government's expert on financial economics. Dr. Lys concluded that "exercising the [repurchase option] is the most advantageous option for transit agencies in virtually all circumstances." The trial court found that Dr. Lys "provided a compelling economic analysis of the SILO transaction." According to the court, Dr. Lys "established beyond doubt that no tax-exempt entity in its right mind would fail to exercise the purchase option."

When the tax-exempt entities make the decision whether to exercise their repurchase options, they will necessarily compare the economic benefits provided by the leased assets with the economic benefits of the alternative options. Prior to the transactions at issue in this case, Wells Fargo's appraisers analyzed the expected benefits to the tax-exempt entity from the repurchase option and the service contract option. The appraisers concluded that the respective benefits and costs of the two options would be such that the tax-exempt entities would not be under any economic compulsion to exercise the repurchase option. Dr. Lys conducted the same analysis but came to a different result. He determined that the value of the leased assets to the tax-exempt entity would greatly exceed the exercise price, meaning that the tax-exempt entity would have a strong economic incentive to repurchase the assets. At trial, Wells Fargo's expert challenged Dr. Lys's analysis and defended the appraisers' analysis.

The crux of the disagreement between Dr. Lys and the appraisers is the discount rate that the tax-exempt entity would apply in calculating the net present value of its

alternatives at the decision point.[2]   The appraisers se-lected the weighted average cost of capital ("WACC") prevailing in the industry sector in which the tax-exempt entity operated (e.g., the rail industry) as the discount rate that the entity would use to compare net present values of the repurchase and service contract options.[3] Dr. Lys equated the discount rate with the rate at which the tax-exempt entity could borrow funds.  According to Dr. Lys, that rate "reflect[ed] the general risk" of the tax-exempt entity.  Wells Fargo's expert, however, testified that Dr. Lys's choice of discount rate "violate[d] a funda-mental tenet of finance," and that the relevant industry WACC was the appropriate discount rate.

Because Dr. Lys used a lower discount rate than the appraisers used, Dr. Lys projected that the leased assets would retain their value better than the appraisers ex-pected and that the cost of the periodic payments to Wells Fargo under the service contract would be higher than the

---

[2]   The present value of a fixed asset incorporates the time value of money and investment risk, as well as depreciation in the case of a depreciable asset.  For a stream of future cash payments, the present values of each payment are calculated separately and summed to yield the net present value.  *See generally* Richard A. Brealey et al., eds., *Principles of Corporate Finance* 14-16 (9th ed. 2008).

[3]   The WACC is the expected return on a portfolio of all of an entity's existing securities.  Those securities consist of both debt and equity.  The WACC is a weighted average of the return that security holders expect on their investments.  For example, if bondholders expect a 3 percent interest rate and stockholders expect a 6 percent return on investment, and a company's debt-to-equity ratio is 2-to-1, the entity's WACC would be 4 percent.  *See* Brealey, *supra*, 241-42.  The calculation of WACC can be very complex, particularly for public entities such as municipal transit agencies.

appraisers expected. Consequently, according to Dr. Lys, there would be no reason for the tax-exempt entity to risk entering into the service contract because it would receive less economic benefit than if it simply repurchased the assets.

Wells Fargo characterizes the trial court's reliance on Dr. Lys's testimony as reflecting the application of an incorrect legal standard. *See Lazare Kaplan Int'l, Inc. v. Photoscribe Techs., Inc.*, 628 F.3d 1359, 1381 (Fed. Cir. 2010). Wells Fargo argues that, as a matter of law, the likelihood of outcomes in SILO transactions must be assessed using estimates based on the fair market value of the assets in question, and it cites the *Frank Lyon* case to support that argument. In *Frank Lyon*, however, there was no service contract, simply a series of purchase options provided to the lessee in a sale-leaseback transaction at future points in time. The purchase option prices were negotiated between the parties and were known at the time the parties entered into the transaction. *Frank Lyon Co. v. United States*, 75-2 USTC ¶ 9545, 36 A.F.T.R.2d 75-5154, 75-5156 (E.D. Ark. 1975). The trial court in that case concluded that the price of the fixed purchase options "represented fair estimates of market value [of the leased building] on the applicable dates," and the Supreme Court did not disagree with that conclusion. 435 U.S. at 569. The Court, however, did not address the appropriate discount rate to use when comparing a fixed purchase option to alternative options. Nothing in the *Frank Lyon* case (or any of the other authorities cited by Wells Fargo) supports Wells Fargo's argument that Dr. Lys's testimony was predicated on a legally incorrect standard. To the contrary, the question of what discount rate is most appropriate to use in estimating the benefits and burdens of purchase and service options that will not be exercised for a number of years is a distinctly factual

matter, and Wells Fargo has not shown that the trial court's acceptance of Dr. Lys's methodology constituted clear error.

In any event, the critical inquiry is whether Wells Fargo could have reasonably expected that the tax-exempt entities would exercise their repurchase options, and the trial court's resolution of that question does not turn on the appropriateness of Dr. Lys's choice of discount rate. While the court found Dr. Lys's testimony "most valuable" on that issue, the court explained that Dr. Lys had simply "confirmed" the court's conclusion based on other evidence. The court noted that "[m]any of the expert witnesses at trial testified as to the probability that the transit agency would elect the [repurchase option] instead of becoming subject to the service contract or the return of the equipment."

For example, an expert on the passenger railcar industry testified that the repurchase option was "very likely" to be exercised in the NJT, Caltrans, and WMATA SILOs, and that there was no foreseeable circumstance in which the option would not be exercised. An urban public transportation expert similarly testified that the four transit agencies were "very likely" to exercise their repurchase options due to the uncertainty and potential difficulties of complying with the service contract option within a short time frame. That expert's report examined each of the transit agency SILOs individually and determined that substantial hurdles would hinder the agencies' compliance with the service contract option. An expert in leasing and asset financing testified that he "[could not] think of a set of circumstances under which CalTrans would not exercise a purchase option, and the requirements [of the alternatives] . . . make it a practical certainty that the purchase option will be exercised." A

Federal Transit Administration witness testified that SILO arrangers consistently told the FTA that it "shouldn't be too concerned about [the possibility of the repurchase option not being exercised] because it was likely that the transit agencies would exercise [it]. It was the easiest way to close the transaction normally." Finally, the court credited the testimony of several witnesses that service contracts are rare in the domestic transit sector, particularly for existing transit services and equipment.

The witness testimony regarding the four transit agency SILOs was supported by documentary evidence. Credit approval presentations ("CAPs") prepared by Wells Fargo before it entered into each SILO suggest that the transactions were designed to encourage the tax-exempt entities to exercise their repurchase options. The NJT CAP, which is representative, states that the transit agency "has all the cash necessary (in the defeasance funds) to purchase the Equipment at the [repurchase option] point and would incur little or no added expense at this point." In an e-mail exchange, the SILO promoters informed representatives of Houston Metro that they "fully anticipate[d] that [Houston Metro] will buy the buses back with the defeasance proceeds." The FTA approved the NJT and WMATA SILO transactions after noting in each case that "[a]t the purchase option date . . . [the transit agency] is expected to exercise its option to buy out the head lease." The FTA considered it a "very low likelihood" that the transit agencies would not exercise the repurchase option.

Wells Fargo points to testimony by employees of the transit agencies who testified that at the time their agencies entered into the SILO transactions, they did not know whether the repurchase options would be exercised.

In addition, several witnesses testified that the transit agencies were under no compulsion to exercise the repurchase options. Those statements do not undermine the trial court's findings. For the most part, the employees' testimony did not evaluate the probabilities of the exercise of the purchase options. To be sure, one Houston Metro employee testified that it was a "realistic" possibility that the repurchase option would not be exercised. In light of the contrary witness testimony and documentation described above, however, that isolated statement is not enough to call into question the trial court's conclusion that the tax-exempt entities were highly unlikely to exercise their repurchase options.

The trial court permissibly found that the expectations were no different for the Belgacom SILO. Wells Fargo's CAP for that transaction notes that Belgacom was expected to exercise its early buyout option. The presentation stated that "the equipment return provisions are strict and onerous to Belgacom . . . providing significant economic incentive for Belgacom to simply purchase the equipment." Similarly, annual internal reviews by Wells Fargo in 2001 and 2002 explain that Belgacom was expected to exercise its early buyout option. The documents are explicit that "[t]he original return provisions of the lease were written with the intention of being overly onerous to make the lease-end return of any equipment an unattractive option."[4] The trial court considered those documents persuasive evidence that Wells Fargo fully

---

[4] Wells Fargo points to a statement in each annual review that "[s]hould the lease run to full maturity, Belgacom will most likely purchase the equipment for Fair Market Value." The conditional part of that statement will be satisfied only if the early buyout option is not exercised, which the same document characterizes as a very unlikely event.

anticipated that Belgacom would exercise its option to repurchase the assets, and that Belgacom was virtually certain to do so. Wells Fargo highlights statements of expert witnesses that Belgacom's exercise of the repurchase option was not completely assured at the outset of the transaction. Once again, however, that evidence does not undermine the trial court's finding that the Belgacom is virtually certain to exercise the repurchase option.

In light of the extensive witness testimony and documentation relied on by the trial court, the provision in each of the five representative SILOs stating that the tax-exempt entity has not "taken any official corporate action pertaining to the exercise or non-exercise of the Purchase Option" rings hollow. The transactions "were part of a prepackaged strategy marketed to shelter taxable gain," *Stobie Creek*, 608 F.3d at 1379, promoted to tax-exempt participants with the understanding that they would exercise their repurchase options. The trial court was justified in concluding that "[f]rom the inception of the transactions, the economic effects of the alternatives were so onerous and detrimental that a rational tax-exempt entity would do nothing other than exercise the options." The court's conclusion is borne out by the fact that Belgacom did in fact exercise its early buyout options on both lots of equipment, and that NJT has exercised its early purchase option on every similar transaction in which it engaged in the past. Thus, even in the absence of Dr. Lys's economic analysis of the representative SILO transactions, the trial court had before it compelling evidence of the very high likelihood that all of the tax-exempt entities would exercise their repurchase options. The trial court therefore did not clearly err in concluding that the tax-exempt entities were virtually certain to repurchase the assets when the lease periods expired.

Wells Fargo argues that this case is governed by the Supreme Court's decision in *Frank Lyon*, in which the Court allowed tax deductions for a "sale-leaseback" transaction having some of the same characteristics as the SILOs at issue here. However, *Frank Lyon* involved a transaction between two taxable entities, and the Supreme Court noted that the facts in that case "stand in contrast to many others in which the form of the transaction actually created tax advantages that, for one reason or another, could not have been enjoyed had the transaction taken another form." 435 U.S. at 583 n.18 (distinguishing *Sun Oil Co. v. Comm'r of Internal Revenue*, 564 F.2d 258 (3d Cir. 1977), a case involving a sale-and-leaseback of land between a taxpayer and a tax-exempt entity).[5] Moreover, the trial court in *Frank Lyon* found that the lessee "was highly unlikely" to exercise its purchase option. *Id.* at 570. Since the decision in *Frank Lyon*, a number of courts have disallowed LILO and SILO transactions between taxpayers and tax-exempt entities. *E.g.*, *BB&T Corp.*, 523 F.3d 461 (LILO); *Altria Grp., Inc.*

---

[5] This court and our predecessor court have not looked favorably upon transactions designed to unlock previously unavailable tax advantages through manipulation of taxable income. In *Rothschild v. United States*, 407 F.2d 404 (Ct. Cl. 1969), the taxpayer "borrowed funds to make an investment which initially would yield him a loss. However, by deducting the interest paid from ordinary income and paying capital gains tax on the profits of the investment, the taxpayer's investment yielded an after-tax profit." 407 F.2d at 405. The court denied the taxpayer deductions stemming from the difference between his marginal income tax rate and the capital gains tax rate. More recently, in *Stobie Creek*, we disallowed deductions where a "tax shelter . . . . took advantage of the fact that assets and contingent liabilities were treated differently for tax purposes when contributed to a partnership, thus enabling the taxpayer to generate an artificial loss." 608 F.3d at 1368-69.

*v. United States*, 694 F. Supp. 2d 259 (S.D.N.Y. 2010)
(LILO and SILO); *AWG Leasing Trust*, 592 F. Supp. 2d
953 (SILO).

The sole exception is *Consolidated Edison Co. v.
United States*, 90 Fed. Cl. 228 (2009), a case that is await-
ing final judgment. In *Consolidated Edison*, the Court of
Federal Claims allowed deductions in a LILO transaction
after finding that it was uncertain whether the tax-
exempt entity would exercise its option to repurchase the
leased assets. Whether that finding was supported by the
evidence and whether the *Consolidated Edison* court
applied the correct legal standard on the issue of probabil-
ity are not questions that we address today. It is suffi-
cient to note that the finders of fact in that case and in
the present case reached different conclusions regarding
the likelihood of the tax-exempt entity exercising its
repurchase option.

IV

Because we uphold the trial court's finding that the
tax-exempt entities are virtually certain to exercise their
repurchase options, we are left with purely circular trans-
actions that elevate form over substance. The only flow of
funds between the parties to the transaction was the
initial lump sum given to the tax-exempt entity as com-
pensation for its participation in the transaction. From
the tax-exempt entity's point of view, the transaction
effectively ended as soon as it began. The benefits to
Wells Fargo continued to flow throughout the term of the
sublease, however, in the form of deferred tax payments.
The third-party lender and its affiliate were also compen-
sated for their participation, as were the creators and
promoters of the transactions. These transactions were
win-win situations for all of the parties involved because

free money—in the form of previously unavailable tax benefits utilized by Wells Fargo—was divided among all parties.  The money was not entirely "free," of course, because it was in effect transferred to Wells Fargo from the public fisc.

We sustain the trial court's conclusion that the SILO transactions at issue in this case run afoul of the substance-over-form doctrine and therefore are abusive tax shelters.  Based on well-grounded factual findings, the trial court permissibly found that the claimed tax deductions are for depreciation on property Wells Fargo never expected to own or operate, interest on debt that existed only on a balance sheet, and write-offs for the costs of transactions that amounted to nothing more than tax deduction arbitrage.  We therefore uphold the judgment of the Court of Federal Claims.

**AFFIRMED**