# United States Court of Appeals for the Federal Circuit

---

**CONSOLIDATED EDISON COMPANY OF NEW YORK, INC. & SUBSIDIARIES,**
*Plaintiff-Appellee,*

v.

**UNITED STATES,**
*Defendant-Appellant.*

---

2012-5040

---

Appeal from the United States Court of Federal Claims in case no. 06-CV-305, Judge Marian Blank Horn.

---

Decided: January 9, 2013

---

DAVID FARRINGTON ABBOTT, Mayer Brown LLP, of New York, New York, argued for plaintiff-appellee. With him on the brief were STEPHEN M. SHAPIRO, JOEL V. WILLIAMSON, TIMOTHY S. BISHOP, THOMAS C. DURHAM, and MICHAEL R. EMERSON, of Chicago, Illinois, and BRIAN W. KITTLE, of New York, New York.

JUDITH A. HAGLEY, Attorney, Tax Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant. With her on the brief were

KATHRYN KENEALLY, Assistant Attorney General, TAMARA W. ASHFORD, Deputy Assistant Attorney General, and GILBERT S. ROTHENBERG and RICHARD FARBER, Attorneys.

———————————

Before LOURIE, DYK, and MOORE, *Circuit Judges*.

DYK, *Circuit Judge*.

In its tax return for the year 1997, Consolidated Edison Company of New York, Inc. and its subsidiaries ("ConEd") claimed multiple deductions pertaining to a lease-in/lease-out ("LILO") tax shelter transaction. The Internal Revenue Service ("IRS") disallowed these claimed deductions and assessed ConEd a deficiency in the amount of $328,066. ConEd paid the deficiency and filed a refund claim with the IRS; when this claim was denied, ConEd filed suit in the Court of Federal Claims (the "Claims Court"). The Claims Court awarded ConEd a full refund, and the United States appealed.

Applying the substance-over-form doctrine under our decision in *Wells Fargo & Co. v. United States*, 641 F.3d 1319 (Fed. Cir. 2011), we conclude that ConEd's claimed deductions must be disallowed. This is so because there was a reasonable likelihood that the tax-indifferent entity in the LILO Transaction (the lessor of the master lease) would exercise its purchase option at the conclusion of the ConEd sublease, thus rendering the master lease illusory. Accordingly, we reverse and remand to the Claims Court for the limited purpose of determining only the refund of previously paid interest ConEd may be entitled to receive.[1]

---

[1] As the government noted in its brief, "[i]f this Court reverses the [Claims Court's] LILO determination, a remand would be necessary to recompute the amount of

BACKGROUND

I

This case requires the court to determine the tax consequences of a LILO transaction, which is one of many "creative strategies" used by taxpayers to "receive greater tax benefits from the property of tax-exempt entities." *Wells Fargo*, 641 F.3d at 1322. Though the LILO Transaction at issue in this case is complex, it has a structure typical of LILOs.

The LILO Transaction is between ConEd and N.V. Electriciteitsbedrijf Zuid-Holland ("EZH"), a Dutch utility. EZH is a so-called tax-indifferent entity because it is not subject to U.S. taxation. The transaction centered around the lease and sublease of a gas-fired, combined cycle cogeneration plant (the "RoCa3 plant") located in the Netherlands. EZH's RoCa3 plant opened for commercial operation in 1996 and delivers heat, electricity, and carbon dioxide to its customers.

ConEd's avowed purpose in entering into the LILO Transaction was to achieve tax avoidance benefits associated with rent and interest deductions. For example, ConEd's former Chief Financial Officer, Joan Frielich, admitted that achieving "front-loaded earnings" was one of the main reasons that ConEd entered into the transaction, and that the "transaction would not have had the front-loaded earnings without the tax benefits." J.A. 2717-18. She also admitted that, without the tax benefits, the return on investment associated with the LILO Transaction would have been insufficient to "make[] the project acceptable." J.A. 2718. A "Leasing White Paper," which was presented to ConEd's board prior to the transaction's

---

previously paid, assessed interest that should be refunded to ConEd." Appellant's Br. 2 n.2.

closing date, also emphasizes the LILO Transaction's "[f]ront [l]oaded [e]arnings" and "[g]ood to [e]xcellent [i]nvestment [y]ields" resulting in part from the tax deductions. J.A. 17,123, 13,469. ConEd's Project Briefing Memorandum, dated October 23, 1997, listed the benefits of the transaction as including (i) tax deductions for the allocated initial rent payment to EZH; and (ii) tax deductions for the interest paid on the loan financing the transaction.[2]

## II

EZH and ConEd formally completed the LILO Transaction on December 15, 1997 (the "Closing Date"), by entering into several agreements. In the master lease agreement governing the LILO Transaction (the "Head Lease Agreement"), EZH conveyed to ConEd a lease interest of an undivided 47.47%[3] in the RoCa3 plant for a

---

[2]    The third benefit listed in the Project Briefing Memorandum is "cash-on-cash return of [ConEd's initial equity] investment," along with "profit received at the end of the term of the [s]ublease." This latter return is merely the return ConEd would receive from the maturity of the zero-coupon U.S. government Treasury bonds, known as STRIPS, that are held in the Equity Defeasance Account, discussed below. This return, however, was reduced by the transaction costs associated with the transaction, such as the equity proceeds that went towards EZH's accommodation fee and its purchase of a letter of credit, as described below.

[3]    In order to simplify the analysis, in the following discussion we treat ConEd as though it had a full interest in the RoCa3 facility, notwithstanding the fact that ConEd had only a 47.47% interest. Banc One Leasing, Inc.—another investor represented by the same financial advisor as ConEd—contemporaneously entered into a LILO with EZH and holds the remaining 52.53% interest. ConEd's share is held, formally, by a trust operated for the benefit of a ConEd subsidiary.

lease term of 43.2 years (the "Head Lease Term"), commencing on December 15, 1997 and ending on February 24, 2041 (the "Head Lease Termination Date"). Simultaneously, ConEd conveyed back the property to EZH. ConEd entered into a sublease agreement with EZH (the "Sublease Agreement") in which EZH subleased ConEd's undivided interest in the RoCa3 plant from ConEd for a term of 20.1 years. This initial term of the sublease (the "Sublease Basic Term") was set to end on January 2, 2018.

Under the Head Lease Agreement, ConEd was obligated to make an immediate Initial Basic Rent Payment of $120,112,270.36. ConEd satisfied this obligation by making an initial equity payment of $39,320,000.00 and borrowing the remaining $80,792,270.36 as a nonrecourse loan, at 7.10% interest, from Hollandsche Bank-Unie (the "HBU Loan"). The equity payment and the HBU Loan satisfied ConEd's initial obligations to EZH under the master lease.[4]

EZH was immediately entitled to the equity payment but, on the day following the Closing Date, the transaction required EZH to transfer approximately $31 million of ConEd's equity payment to Credit Suisse First Boston to create an Equity Defeasance Account.[5] The funds in this account were invested in zero-coupon U.S. govern-

---

[4] ConEd is also responsible for a Final Basic Rent Payment under the Head Lease Agreement in the amount of $831,525,734.00, which is due on the Head Lease Termination Date in 2041. However, ConEd would not be responsible for this payment in the event that EZH exercises the Sublease Purchase Option, described below.

[5] Of the remaining $8 million of ConEd's equity contribution, EZH used $1.4 million to obtain a letter of credit securing its sublease obligations to ConEd in the event of EZH's default, and retained the remaining $6.7 million as an "accommodation fee."

ment Treasury bonds known as STRIPS, and EZH pledged its interest in the account to ConEd to secure EZH's payment obligations under the sublease.

The account holding the proceeds of the ConEd HBU Loan was called the Debt Defeasance Account, and was held by ABN AMRO Bank N.V. ("ABN") (the parent company of HBU at the time of the closing). In general, EZH was to make annual withdrawals from the Debt Defeasance Account (satisfying ConEd's obligations to EZH under the Head Lease Agreement), and at the same time was to make payments in identical amounts to HBU to pay down ConEd's HBU loan (satisfying EZH's sublease rent obligation to ConEd under the sublease). At any given time, the amount remaining in the Debt Defeasance Account was to equal ConEd's remaining principal and interest payment obligations under the HBU Loan.[6]

---

[6]   The amount EZH was to withdraw from the Debt Defeasance Account was to be equal in amount to EZH's Sublease Basic Rent payments for the years 2005 through 2018. EZH was to satisfy its Sublease Basic Rent obligations from 1998 through 2003 by borrowing money from ConEd under a loan (the "Sublessee Loan"). As with the Debt Defeasance Account withdrawals, EZH's scheduled annual withdrawals under the Sublessee Loan were also to be equal in amount and timing to the Sublease Basic Rent owed to ConEd in each year of the Sublease Basic Term (with the exception of 2004). For 2004, EZH's Sublease Basic Rent obligation was to be satisfied from a combination of the scheduled withdrawals from the Sublessee Loan and the Debt Defeasance Account. The Sublessee Loan was established for EZH's benefit so that it could defer out of pocket payments on the Sublease from 1997 through a portion of 2004. According to the Sublessee Loan Documents, EZH was responsible to repay the Sublessee Loan obligation to ConEd. EZH's obligation to repay the Sublessee Loan was to be extinguished if EZH exercised the Sublease Purchase Option (which is discussed below), because ConEd would extinguish EZH's

The Debt Defeasance Account was structured to earn 7.10% interest, which was the same interest rate as that associated with the HBU Loan. The effect was such that the HBU Loan proceeds were deposited in the Debt Defeasance Account, and the principal and interest on the loan were paid from those proceeds, together with the interest those proceeds earned in the account.

Under the Sublease Agreement, EZH was required to "maintain, overhaul, inspect, test, repair, and service the [RoCa3 plant] at its own expense during the Sublease Basic Term on a basis comparable to EZH's maintenance of similar facilities that it owns, leases[,] or operates." *Consol. Edison Co. of N.Y., Inc. v. United States* (*ConEd*), 90 Fed. Cl. 228, 241 (2009). As described above, ConEd paid EZH an "accommodation fee" of approximately $6.7 million in exchange for EZH's willingness to enter into the transaction.

The transaction was structured so that EZH could reacquire its original interest in the RoCa3 Plant at the end of the Sublease Basic Term. A Sublease Purchase Option allowed EZH to purchase ConEd's remaining interest in the Head Lease Term for $215,450,949.20 in 2018. If EZH declined to exercise the Sublease Purchase Option, ConEd had the opportunity to exercise one of two options. It could exercise the Sublease Renewal Option, under which EZH would be required to renew the sublease for an additional renewal term of 16.5 years. At the end of the sublease renewal term, ConEd would operate the plant or find a new sublessee for the remaining term of the head lease (the "Shirt-Tail Period"). In the alternative, ConEd

loan obligation upon EZH's exercise of the option. The parties do not make clear whether the Sublessee Loan was to be somehow repaid to ConEd by EZH or whether it represented an additional transaction cost to ConEd.

could exercise the Sublease Retention Option, under which EZH would return the remaining interest in the Head Lease Term to ConEd, allowing ConEd to take over the RoCa3 Plant's operations for the remainder of the Head Lease Term.

## III

A LILO tax shelter is designed to accelerate losses to the taxpayer and defer gains, so as to take advantage of the time value of money by delaying tax payments. The structure of the LILO Transaction facilitated several up-front deductions that allowed ConEd to pay lower taxes in 1997 (and in later years) than it otherwise would have. Because a large entity such as ConEd reports annual income in the hundreds of millions of dollars, additional deductions offset part of that income and produce substantial tax savings. A tax-indifferent entity such as EZH, unlike ConEd, does not pay U.S. income taxes, and therefore cannot offset its income with such deductions. Meanwhile, the LILO Transaction allows EZH to benefit from the accommodation fee and, at the same time, maintain uninhibited operation of the RoCa3 Plant.

The deductions ConEd claimed for tax year 1997 were as follows. First, ConEd deducted rent it paid to EZH in the amount of $1,072,652.[7] Such rental deductions are allowed under the Internal Revenue Code where those payments are "required to be made as a condition to the

---

[7] ConEd calculated its rent deductions using the terms of Internal Revenue Code § 467 that were applicable at the time of the transaction Closing Date. According to the government, the $120 million Initial Rent Payment under the head lease was allocated over the first five years of the head lease (plus a portion of 2003), and the $831.5 million deferred head lease rent was allocated to the remaining years of the head lease on an undiscounted basis.

continued use or possession, for purposes of the [taxpaying] trade or business, of property." I.R.C. § 162(a)(3). Second, ConEd deducted interest payments associated with the HBU Loan in the amount of $254,944. Interest deductions are allowed for "all interest paid or accrued within the taxable year on indebtedness." I.R.C. § 163(a). Although the tax impact at issue in this case—specifically, the impact resulting from these deductions for tax year 1997—was only $328,066, the projected tax savings from ConEd's use of these deductions in subsequent years of the transaction was substantial. For example, the projected tax savings to ConEd during each tax year from 1998 through 2001 was over $7 million per year.

IV

The government's primary contention is that EZH was reasonably likely to exercise the Sublease Purchase Option, and that, as a result, the purported master lease (or head lease) should not be treated as a true lease, and the tax deductions that would flow from a true lease were not available to ConEd. The government argues that the interest deductions associated with the HBU Loan were likewise not available.

The government points out that in the event that EZH exercised the Sublease Purchase Option the transaction would be completed at no risk to ConEd. In general, the head lease payments ConEd made would be recovered through the sublease payments made by EZH. The proceeds ConEd obtained from EZH's exercise of the Sublease Purchase Option would include the amounts remaining in the Debt Defeasance account and would ensure that the remaining HBU Loan would be paid in full at no future cost to ConEd. ConEd, meanwhile, would receive most of the equity contribution in the Equity Defeasance Account

back as part of the option purchase price (reduced by the fees necessary to create the transaction). ConEd would receive a return on its equity investment in the U.S. government Treasury STRIPS invested through the Equity Defeasance Account. ConEd would not need to assume any risks associated with operating the RoCa3 Plant, since EZH would continue to manage and operate the RoCa3 Plant as it had before. All of ConEd's future obligations under the head lease would be extinguished.

So too, ConEd would bear no risk associated with the HBU Loan. At the relevant time, HBU was a subsidiary of ABN, which managed the Debt Defeasance Account that held the loan's proceeds. As discussed above, the approximately $81 million in loan proceeds were designed to flow in a loop from HBU to ConEd to EZH and back to HBU. Moreover, ConEd's risk on the loan would be eliminated because EZH purchased a letter of credit for approximately $1,412,594.12 to secure its obligations to ConEd under the sublease. ConEd's tax advisor described the HBU Loan as containing "100% loop debt," and ABN treated the loan as being "off balance sheet." J.A. 23,353, 17,140. Throughout the transaction, ABN had "irrevocable" control of the funds. J.A. 10,432, 10,444.

V

The IRS assessed the deficiency against ConEd for 1997. ConEd paid the deficiency and sued for a refund in the Claims Court. The Claims Court, after a trial, determined that the transaction could not be ignored under the substance-over-form doctrine. It concluded that ConEd had "established . . . that the RoCa3 [LILO] Transaction was a unique LILO transaction, which provided tax and bookkeeping advantages to the plaintiff; was, in form, a true lease; . . . and, therefore, should be respected as

qualifying for the tax deductions claimed." *ConEd*, 90 Fed. Cl. at 340.

The Claims Court also "conclude[d] that there is no certainty that EZH will exercise the Sublease Purchase Option." *Id.* at 295. It followed that the transaction, "although insulated to minimize risk, was not without risk" and that "[t]he RoCa3 [LILO] Transaction presented three separate, viable Options [i.e., the Retention, Renewal, and Sublease Purchase Options] that could be exercised at the end of the Sublease Basic Term, none of which was guaranteed or inevitable at the time the Transaction was consummated." *Id.* at 340. Thus, the Claims Court concluded that ConEd's claimed interest and rent deductions were "allowable." *Id.* at 341. The full judgment for ConEd was in the amount of $5,977,220.09, which consisted of a full refund of the deficiency related to the LILO ($328,066.00), a refund of ConEd's overpayment of previously-paid assessed interest ($3,226,868.90), and reimbursement for a preexisting credit balance ($2,422,285.19).

The United States timely appealed the Claims Court's ruling and challenges its ruling under the substance-over-form doctrine.[8] We have jurisdiction under 28 U.S.C. § 1295(a)(3). "We review the characterization of transactions for tax purposes de novo, based on underlying findings of fact, which we review for clear error." *Wells Fargo*, 641 F.3d at 1325 (citing *Stobie Creek Invs., LLC v. United States*, 608 F.3d 1366, 1375 (Fed. Cir. 2010)).

---

[8]    The Claims Court also concluded that the LILO Transaction satisfied the economic substance doctrine. *See ConEd*, 90 Fed. Cl. at 341 (concluding that the transaction "possessed economic substance"). On appeal, the government does not challenge the Claims Court ruling under the economic substance doctrine.

DISCUSSION

As we stated in *Coltec*, judicial anti-abuse doctrines "prevent taxpayers from subverting the legislative purpose of the tax code." *Coltec Indus., Inc. v. United States*, 454 F.3d 1340, 1354 (Fed Cir. 2006). One such doctrine is the substance-over-form doctrine. Under this doctrine, courts determine "the tax consequences of a transaction . . . based on the underlying substance of the transaction rather than its legal form." *Wells Fargo*, 641 F.3d at 1325 (citing *Griffiths v. Helvering*, 308 U.S. 355, 357 (1939)). "The major purpose of the substance-over-form doctrine is to recharacterize transactions in accordance with their true nature." *Southgate Master Fund, L.L.C. ex rel. Montgomery Capital Advisors, LLC v. United States*, 659 F.3d 466, 491-92 (5th Cir. 2011) (internal quotation marks omitted)).

This substance-over-form doctrine, like the economic substance doctrine, "is merely a judicial tool for effectuating the underlying Congressional purpose that, despite literal compliance with the statute, tax benefits not be afforded based on transactions lacking . . . substance." *Coltec*, 454 F.3d at 1354. The Supreme Court recognized the substance-over-form doctrine in *Frank Lyon Co. v. United States*, where it noted that "[t]he Court has never regarded 'the simple expedient of drawing up papers' as controlling for tax purposes when the economic realities [of the transaction] are to the contrary." 435 U.S. 561, 573 (1978) (quoting *Comm'r v. Tower*, 327 U.S. 280, 291 (1946)).

The government urges that we should reverse the Claims Court's refusal to apply the substance-over-form doctrine here for two reasons. First, if the Sublease Purchase Option were reasonably expected to be exercised, the transaction would be recharacterized as one without

any meaningful substance. Second, the government urges that, even if the Sublease Purchase Option were not exercised, ConEd would not bear any residual value risk associated with the transaction because "ConEd has the ability to exercise its sublease-renewal option, and thereby recoup its investment through EZH's continuing, pre-determined rent obligations, the payment of which is secured by the Treasury STRIPS held in the Equity Defeasance Account and a letter of credit." Appellant's Br. 53-54. Because ConEd would not bear any risk, the government argues, the transaction should be ignored as lacking substance. Since we agree with the government's first theory, we do not address the second.

I

Both LILO and related sale-in/lease-out ("SILO") transactions have been utilized by taxpayers in attempts to avoid taxes. A SILO transaction is identical to a LILO transaction except that the head lease term is longer than the useful life of the facility, so that the IRS ignores the lease arrangement and "treats the head lease as a sale of the asset." *Wells Fargo*, 641 F.3d at 1321. The result, as with a LILO transaction, is that the taxpayer is not entitled to deductions premised on treating the transaction as a genuine lease and sublease.

Before Congress amended the Internal Revenue Code and put an end to the tax benefits associated with LILO and SILO transactions in 2004, *see id.* at 1323 (citing American Jobs Creation Act of 2004, Pub. L. No. 108-357, 118 Stat. 1418), the LILO and SILO transactions were not uncommon, nor was litigation concerning the tax consequences of such transactions. Taxpayers have not been successful in these cases. Every circuit (including our own) that has considered LILOs or SILOs has held that such transactions do not pass the substance-over-form

test. *See Altria Grp., Inc. v. United States*, 658 F.3d 276 (2d Cir. 2011) (affirming a jury's determination that a series of LILO and other transactions did not withstand the substance-over-form inquiry); *Wells Fargo*, 641 F.3d 1319; *BB&T Corp. v. United States*, 523 F.3d 461, 464 (4th Cir. 2008) (affirming district court's conclusion that "although the form of [a LILO] transaction involved a lease financed by a loan, BB&T did not actually acquire a genuine leasehold interest or incur genuine indebtedness as a result of the transaction").

In addressing the issues here we are obligated to follow this court's prior decision in *Wells Fargo*. The transactions at issue in *Wells Fargo* were SILO transactions involving leases and subleases of various public transit vehicles. The transactions, like those in *BB&T*, *Altria*, and this case, contained purchase options as well as options similar to the renewal and retention options here. *See Wells Fargo*, 641 F.3d at 1323-24. The Claims Court found that "Wells Fargo expected the tax exempt entities to exercise their options to repurchase their assets because 'the economic effects of the alternatives were so onerous and detrimental that a rational tax-exempt entity would do nothing other than exercise the options.'" *Id.* at 1324. The Claims Court had recharacterized the transactions as ones that "'essentially amount[ed] to Wells Fargo's purchase of tax benefits for a fee from a tax-exempt entity that cannot use the deductions,'" and disregarded the transactions under the substance-over-form doctrine. *Id.* (alteration in original). We held that the Claims Court did not clearly err in "finding that the tax-exempt entities [we]re virtually certain to exercise their repurchase options." *Id.* at 1330. Thus, applying the appropriate test under the substance-over-form doctrine, which asks "whether Wells Fargo could have reasonably expected that the tax-exempt entities would exercise their

repurchase options," *id.* at 1327, we easily concluded that the court was "left with purely circular transactions that elevate[d] form over substance." *Id.* at 1330. Specifically, "the claimed tax deductions [we]re for depreciation on property that Wells Fargo never expected to own or operate, interest on debt that existed only on a balance sheet, and write-offs for the costs of transactions that amounted to nothing more than tax deduction arbitrage." *Id.*

In this case, as in *Wells Fargo*, our key inquiry is whether EZH would exercise its purchase option at the end of the Sublease Basic Term. If the Sublease Purchase Option were exercised, the transaction would merely become a transaction in which ConEd leased the RoCa3 Plant from EZH and leased it back for the same identical period. Such a transaction lacks substance. This would particularly be so here because EZH would maintain uninterrupted use of the RoCa3 Plant without any involvement on ConEd's part and ConEd would not experience any benefits or burdens associated with its leasehold interest.

## II

ConEd argues that, unlike in *Wells Fargo*, the Claims Court (applying the proper standard) here made factual findings in ConEd's favor with respect to the likelihood that the tax-indifferent entity would exercise the purchase option. ConEd argues that these findings were not clearly erroneous, and that this distinguishes this case from *Wells Fargo*.

ConEd's argument rests on three erroneous premises.

## A

First, ConEd mistakenly argues that, under *Wells Fargo*, the purchase option is significant only if it is

"certain" to be exercised. While the district court found that the options at issue in *Wells Fargo* were virtually certain to be exercised and we held on appeal that this finding was not clearly erroneous, *see* 641 F.3d at 1329, we made clear that the relevant standard was reasonable likelihood. In evaluating whether the LILO Transaction in this case must be recharacterized, *Wells Fargo* requires that we assess whether a prudent investor in ConEd's position would have reasonably expected that EZH would exercise the purchase option. As we stated in *Wells Fargo*:

> We have never held that the likelihood of a particular outcome in a business transaction must be absolutely certain before determining whether the transaction constitutes an abuse of the tax system. *The appropriate inquiry is whether a prudent investor in the taxpayer's position would have reasonably expected that outcome.* Characterization of a tax transaction based on a highly probable outcome may be appropriate, particularly where the structure of the transaction is designed to strongly discourage alternative outcomes.

641 F.3d at 1325-26 (emphasis added). This language makes clear that a "reasonable expectation" standard, rather than a "certainty" standard, governs the recharacterization of transactions under the substance-over-form doctrine. In our view, and consistent with *Wells Fargo*, therefore, the "critical inquiry" is whether ConEd "could have reasonably expected that the tax-[indifferent] entit[y] would exercise [its] repurchase option[]." *Id.* at 1327.

## B

Second, ConEd is mistaken in arguing that the Claims Court here applied the correct *Wells Fargo* standard. ConEd argues that the Claims Court applied the *Wells Fargo* standard and found that "EZH is not 'likely'

to exercise its purchase option." Appellee's Br. 41. This is simply not an accurate characterization of the Claims Court's findings, and it is based on quoting a portion of the Claims Court's opinion that merely describes ConEd's evidence.[9] When the Claims Court made factual findings it assumed (erroneously) that the applicable standard was whether EZH was "certain" to exercise the option. The Claims Court specifically concluded that because "the Sublease Purchase Option was not certain to be exercised by EZH, . . . [ConEd] had the benefit of potential profit and burdens of possible lost monies . . . ." *ConEd*, 90 Fed. Cl. at 304. Similarly, it noted that ConEd's investment was subject to market risk "[b]ecause the Sublease Purchase Option is not certain to be exercised," *id.* at 298; that the LILO Transaction "consisted of three possible scenarios, none of which was certain to occur after the initial lease term," *id.* at 306; and that there was "no guarantee" that the Sublease Purchase Option would be exercised as of "December 1997, when the Transaction was consummated." *Id.*[10] The Claims Court applied the

---

[9] The Claims Court opinion states that *the appraisal report commissioned by ConEd* "conclude[d] that a decision by EZH to exercise the Sublease Purchase Option was not a necessary, or even likely outcome" of the transaction. *ConEd*, 90 Fed. Cl. at 277. ConEd, however, cannot point to any passage in the opinion suggesting that this was *the Claims Court's* ultimate factual finding. ConEd repeats its mischaracterization several times throughout its brief.

[10] Other examples of the Claims Court's application of a certainty standard (or the equivalent) abound. *See ConEd*, 90 Fed. Cl. at 293 ("[W]hat became clear is that in 1997 there was no certainty as to which of the out-year options would be exercised by EZH . . . ."); *id.* at 294 ("[T]he court concludes that in the RoCa3 Transaction, the Sublease Purchase Option is not certain to be exercised."); *id.* at 295 ("[T]he trial testimony and exhibits lead the court to conclude that there is no certainty that EZH will

wrong standard—understandably because, at the time that it rendered its decision, the Claims Court here did not have the benefit of our *Wells Fargo* decision.

## C

Finally, ConEd mistakenly argues that even if "reasonable likelihood" is the correct standard, and was misapplied by the Claims Court, a remand is required for the Claims Court to decide this case under the correct standard. This argument rests on ConEd's view that the record could support a finding that EZH was not reasonably likely to exercise the option. We disagree with ConEd's assessment of the evidence. ConEd has the burden of proof to show that EZH's exercise of the purchase option is not reasonably likely. *See United States v. Janis*, 428 U.S. 433, 440-41 (1976) ("In a refund suit the taxpayer bears the burden of proving the amount he is

exercise the Sublease Purchase Option . . . ."); *id.* at 306 ("The Transaction, as it was put into place by the parties, consisted of three possible scenarios, none of which was certain to occur after the initial lease term . . . ."); *id.* ("[A]t the time of the Transaction, there was no certainty that the Sublease Purchase Option would be exercised."); *id.* at 323 (noting that the Sublease Purchase Option is "not certain to occur"); *id.* at 331-32 ("EZH is not certain to exercise the Sublease Purchase Option, and if EZH does not exercise the Sublease Purchase Option, both the residual value risk and potential profit are present for the plaintiff."); *id.* at 335 (noting that "exercise of the Sublease Purchase Option in the RoCa3 Transaction was not all but certain"); *id.* at 340 ("There was no proof presented or certainty that EZH would necessarily exercise the Sublease Purchase Option."); *see also id.* at 294 ("[T]he Sublease Purchase Option is not guaranteed to be exercised and, therefore, contrary to some other LILO cases, . . . the plaintiff's investment was placed at risk . . . ."); *id.* at 277 (stating that exercise of the option "[was] not the inevitable outcome" of the transaction).

entitled to recover."); *Helvering v. Taylor*, 293 U.S. 507, 515 (1935) ("Unquestionably the burden of proof is on the taxpayer to show that the Commissioner's determination is invalid."); *Coltec*, 454 F.3d at 1355 ("[I]t is the taxpayer who bears the burden of proving that the transaction has economic substance."); *Charron v. United States*, 200 F.3d 785, 792 (Fed. Cir. 1999) ("Since the [plaintiffs] were seeking refunds of taxes they had paid, they have the burden of proving they are entitled to the amount sought."). And in this case, ConEd has not met this burden.

The record demonstrates that ConEd's own contemporaneous statements made shortly before the Closing Date reveal ConEd's expectation that EZH would exercise the purchase option. Brian DePlautt, the Vice President of the ConEd subsidiary responsible for the RoCa3 transaction, admitted that ConEd believed that EZH preplanned to exercise the option before the closing date of the transaction. Responding to an inquiry from ConEd's accountant, PriceWaterhouse, on November 21, 1997, asking whether EZH's exercise of the purchase option was "reasonably assured," DePlautt responded:

> Yes, among the reasons are (a) [the RoCa3] facility is a newly built key asset for [EZH], [and] (b) [EZH] has preplanned for purchase and done [its] economic analysis on the assumption that the plant will be purchased.

J.A. 25,776, 25,779. By that DePlautt meant that exercise of the purchase option would "more likely than not" occur (i.e., exercise was "over 50 percent" probable), and he admitted that he believed going into the transaction "that EZH had preplanned for the exercise of the purchase option." J.A. 4140, 4238. Additionally, in a November 26,

1997, memo, ConEd acknowledged a Transaction Structure Description document from Cornerstone, the LILO promoter, which indicated that "'it is reasonable to assume . . . that [EZH] will exercise the purchase option.'"[11] J.A. 16,032. Finally, in ConEd's own internal analyses of the transaction, ConEd admitted that it "assume[d] no economic benefit" from the Shirt-Tail period following the Sublease Renewal Option, *see* J.A. 16,615, suggesting that it did not fully consider situations that could arise where EZH declined the Sublease Purchase Option. Although ConEd asserted at oral argument before our court that DePlautt's admissions only constituted the subjective views of one executive at the time the documents were written, and that ConEd changed its prediction prior to the Closing Date, the evidence ConEd cites for this proposition merely indicates that ConEd, in its financial accounting of the transaction, booked the transaction over the entire 44-year term of the head lease. This is hardly a surprise. ConEd was required to account for the transaction in this manner if it wished to take the claimed deductions. This accounting treatment does not negate the

---

[11] The full quote from the Transaction Structure description document reads as follows:

> Although the Purchase Option Price will be greater than or equal to the expected fair market value of the Sublessor's Lease Interest, taking into account possible required renewal rents, other non economic factors such as the strategic nature of the asset to Sublessee's business and the fact that the proceeds required to purchase the Sublessor's Lease interest are set aside at closing tend to shift the probability of the Sublessee executing the purchase option. It is reasonable to assume, based on non economic factors mentioned above plus the credit and collateral requirements outlined below that the Sublessee will exercise the Purchase Option.

uncontradicted evidence that ConEd reasonably expected the purchase option to be exercised.[12]

ConEd also failed to establish that a reasonable company in ConEd's position would not have expected that EZH was reasonably likely to exercise the option. ConEd relies on an appraisal it obtained from Deloitte & Touche (the "Deloitte Report") to demonstrate that a prudent investor would not have reasonably expected that EZH would exercise the Sublease Purchase Option. But the Deloitte Report is primarily based on the notion that, in Deloitte's view, there was no "economic compulsion" to exercise the Sublease Purchase Option because the Sublease Option Price would exceed the projected value of the property. J.A. 10,572.

Deloitte's analysis is insufficient to establish that EZH was not reasonably likely to exercise the purchase option. It is uncontested that several factors would bear on the likelihood of exercise such as (1) non-economic factors; and (2) the costs to EZH that would result from ConEd's exercise of the renewal or retention options if EZH declined to exercise the Sublease Purchase Option. Under either the renewal or retention option EZH faced substantial risks and the potential for adverse financial impacts, just as in ConEd's view ConEd faced residual risks if either option were exercised. If ConEd exercised

---

[12]  ConEd argues that EZH's formal statements that "[t]here is no known factor to EZH which creates a material inducement for EZH to exercise the Purchase Option," J.A. 11,511, 20,878, suggest that EZH did not preplan to exercise the option. However, these statements appear to be a boilerplate representations that EZH was required to make under its Tax Indemnity Agreement with ConEd. *See* J.A. 9677. These representations had no effect on ConEd's understanding that EZH preplanned to exercise the option, as reflected in DePlautt's testimony.

the Renewal Option, for example, EZH would potentially lose the ability to operate the plant profitably during the Shirt-Tail Period; and under the Retention Option, EZH would risk losing the right to operate the plant profitably during the remainder of the head lease. As ConEd admits, "EZH can be replaced as the operator of RoCa3" at the end of the sublease. Appellee's Br. 48.

At the same time, the Sublease Purchase Option required no out-of-pocket funds, as the money EZH would require to exercise the Sublease Purchase Options was set aside in the two defeasance accounts. *Cf. BB&T*, 523 F.3d at 473 n.13 ("BB&T supplied the funds for the purchase [option] . . . . Because the 'purchase' is free to [the tax-indifferent entity], price cannot be [an] obstacle."). As of 2018, the Debt Defeasance Account would still have a balance of $116,252,521.63, which EZH could apply to the Sublease Purchase Option payment. Meanwhile, EZH would be entitled to apply the amounts in the Equity Defeasance Account to the Sublease Purchase Option price using matured treasury STRIPS. All but one of the zero-coupon U.S. Government treasury STRIPS in the Equity Defeasance Account are set to mature in 2017 or 2018,[13] and the total value of these bonds at maturity is $99,199,000.00. The appropriate amounts that EZH would be entitled to in 2018 thus amounted to just over $215,451,000.00, the cost of the Sublease Purchase Option, rendering the option effectively costless to EZH.

---

[13] One other treasury STRIPS matured as of 2011 and is valued at $5,221,000.00. This bond is not included in the total value of the bonds needed to exercise the Sublease Purchase Option, but is paid in cash from EZH to ConEd as an additional sublease rent payment in 2012. This is referred to as the "free cash payment" in the record.

Deloitte failed to address these considerations. Though Deloitte's Report contained boilerplate references suggesting that Deloitte considered "other identifiable factor[s]" as well as the costs that EZH would accrue if it were to decline the Sublease Purchase Option, J.A. 10,572, there were no calculations cited in the Deloitte Report that analyzed the non-economic and other considerations described above.[14] More importantly, the author of the Deloitte report, Ellsworth, admitted at his deposition that Deloitte failed to consider the consequences to EZH of not exercising the purchase option. The following exchange occurred:

> Q. Mr. Ellsworth, did you consider in drafting your report the consequences to EZH of not exercising the purchase option?
> A. That subject was not something that we were asked to provide an opinion on as part of the appraisal report.

J.A. 3768. Ellsworth also admitted that Deloitte failed to consider the source of the purchase option funding in assessing the likelihood that EZH would exercise the

---

[14] Certain calculations that appear in the Deloitte Report and Kelly's expert report, *see* J.A. 28,857, 28,871, purport to analyze the costs and benefits associated with ConEd's decisions to exercise either the sublease renewal or retention options (in the event that EZH declines the Sublease Purchase Option). However, these calculations considered the cash flows that would flow to and from EZH and ConEd under each of the two options, and do not assess all of the factors discussed above that would be relevant to EZH's analysis of whether or not it would prefer either of these options over exercise of the Sublease Purchase Option. Additionally, these calculations do not consider the probability that ConEd would exercise either the renewal or retention option, which would bear on EZH's decision as well.

purchase option. Finally, Deloitte admitted that it produced on "the order of magnitude" of 100 appraisal reports of LILO transactions and never once found that there was "economic compulsion" to exercise a purchase option, further underscoring the boilerplate nature of its analyses. J.A. 3795-96. ConEd also cites the Kelly expert report as independent evidence that EZH was not reasonably likely to exercise the Sublease Purchase Option, but the Kelly report merely relied on the Deloitte Report's analysis.

At oral argument, ConEd confirmed that Deloitte did not consider either the non-economic factors relevant to EZH's exercise of the purchase option or the consequences that EZH would face if it were not to have exercised the Sublease Purchase Option. ConEd also admitted that the Kelly expert report did not consider these factors. ConEd's other experts lend no support to its position. Though ConEd argues that Reed's testimony suggests that exercise of the option was impossible to predict, for example, he merely testified that there was "uncertainty associated with whether the option will or will not be exercised" and that it was "impossible to determine [the purchase option's exercise] *with virtual certainty* as of December 15, 1997."[15] J.A. 4657; *ConEd*, 90 Fed. Cl. at 285 (emphasis added).Thus ConEd presented no evidence that exercise of the purchase option was not reasonably likely by a prudent investor.

---

[15]  Goulding, another ConEd expert, also does not disturb our conclusion, as he merely testified that EZH was not under any "compulsion" to exercise the purchase option because EZH would not be bound by regulations to supply power from the RoCa3 Plant in 2018. J.A. 4448. Though this factor may not have compelled EZH to exercise the option, he did not provide evidence suggesting that the other factors described above would not make EZH reasonably likely to exercise the option.

To the extent that ConEd argues that the government's experts made concessions that the likelihood of EZH's exercise of the purchase option was speculative, it is clear that their "concessions" were merely admissions of the obvious: that the future exercise of the purchase option could not be guaranteed with complete certainty. Samuel Ray, a consultant in equipment leasing and financing, merely stated that he did not "know for certain" if EZH was going to exercise the option, while making his opinion clear in his expert report that "it is reasonable that EZH will exercise the Sublease Purchase Option at the end of the Sublease Bas[ic] Term." J.A. 6866, 29,506. David W. LaRue, a professor retained by the government, admitted that there is "[a] *certain* amount of speculation" associated with EZH's exercise of the purchase option, but also testified that he "conclu[ded] that it was highly likely that EZH would exercise the fixed purchase option."[16] J.A. 7179 (emphasis added); Trial Tr. 5087. The government's evidence, therefore, would not support a finding that exercise of the option was not reasonably likely.

Because the undisputed evidence establishes that EZH was reasonably likely to exercise the purchase option, ConEd has failed to show that the substance of the transaction included a genuine leasehold interest in which ConEd would bear the benefits and burdens of a lease transaction. Therefore, the LILO Transaction does not constitute a true lease and ConEd's rent deductions

---

[16]    ConEd argues that LaRue testified that EZH's exercise of the purchase option would be "pure speculation." J.A. 7179. This characterization of LaRue's testimony is incorrect, as he only stated that it would be "pure speculation" to know, prior to 2018, any of the individual factors relevant to EZH's purchase option decision with certainty. *Id.*

were properly disallowed under § 162(a)(3) of the Internal Revenue Code.

## III

Finally, we must also consider whether ConEd is entitled to its interest deductions associated with the HBU Loan under § 163(a) of the Internal Revenue Code. To achieve such deductions, the taxpayer must incur "*genuine* indebtedness" associated with the LILO Transaction. *See BB&T*, 523 F.3d at 475 (internal quotation mark omitted). In this case, it is clear that the loan is not genuine. As noted above, ConEd undertook approximately $81 million in debt from HBU, EZH withdraws from this account to satisfy ConEd's Initial Head Lease Payment obligation, and EZH pays back into this account (with payments that are equal in amount) in order satisfy its sublease obligations. The loan proceeds effectively remain in the account to satisfy ConEd's loan obligation to HBU. Interest payments associated with genuine indebtedness are viewed as "compensation for the use or forbearance of money." *Deputy v. du Pont*, 308 U.S. 488, 498 (1940). Here, the funds from ConEd's HBU Loan flowed from ABN (to fulfill the head lease obligation) and then back to ABN (to fulfill the sublease obligation) in a loop. The facts that ConEd's tax advisor referred to the transaction as having "100% loop debt," J.A. 23,353**,** and that ABN treated the transaction as "off balance sheet," *id.* 17,140, are unsurprising given that the money from the transaction would never leave ABN's hands under the Sublease Purchase Option. As in *BB&T*, "ABN, which treated the loan as an off-balance sheet transaction, did not forbear any money during the time period in which BB & T sought to claim interest deductions." 523 F.3d at 476; *see also Altria*, 658 F.3d at 290-91 ("The evidence . . . reasonably supported the jury's finding that the nonrecourse debt Altria incurred was not genuine. The lender never

forbore use of the purportedly loaned funds and Altria never obtained use of those funds."). Following the Fourth Circuit, we agree that "[a] party simply does not incur genuine indebtedness by taking money out of a bank and then immediately returning it to the issuing bank." *BB&T*, 523 F.3d at 477. ConEd is not entitled to its interest deductions under § 163(a).

## CONCLUSION

For the foregoing reasons, we reverse the judgment of the Claims Court in which it upheld ConEd's claimed deductions with respect to the LILO Transaction, and remand to the Claims Court so that it may properly recalculate ConEd's refund in light of this decision.

## REVERSED AND REMANDED