In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

Nos. 17-2964, 17-2965

EXELON CORPORATION,

*Petitioner-Appellant,*

*v.*

COMMISSIONER OF INTERNAL REVENUE,

*Respondent-Appellee.*

———————————

Appeals from the United States Tax Court
Nos. 29183-13, 29184-13 — **David Laro**, *Judge.*

———————————

ARGUED MAY 24, 2018 — DECIDED OCTOBER 3, 2018

———————————

Before MANION AND BARRETT, *Circuit Judges, and*
GETTLEMAN, *District Judge.**

———————————

* Of the Northern District of Illinois, sitting by designation.

GETTLEMAN, *District Judge*. Petitioner-Appellant Exelon Corporation ("Exelon")[1] appeals from a decision of the United States tax court which upheld a determination by the Commissioner of Internal Revenue that Exelon is liable for a deficiency of $431,174,592 for the 1999 tax year and $5,534,611 for the 2001 tax year. The tax court also affirmed the imposition of $87 million in accuracy-related penalties. We affirm both decisions.

## I.

In 1999, after deregulation of the energy industry in Illinois, Exelon, an Illinois-based energy company, decided to sell its fossil-fuel power plants, intending to use the proceeds to finance improvements to its nuclear plants and infrastructure. It sold all of its fossil-fuel power plants for $4.8 billion, over $2 billion more than expected. Using $2.35 billion of the proceeds to update its nuclear fleet, Exelon was left with approximately $2.45 billion to invest. It was also left with a significant tax bill. It thus began looking for a strategy that could reduce or defer the tax on the gain.

Enter PricewaterhouseCoopers ("PwC"), one of Exelon's accounting firms. PwC proposed that Exelon could defer the tax liability on the gains from the sale of its power plants by executing "like-kind exchanges" under § 1031 of the Tax Code, which provides: "No gain or loss shall be recognized on the exchange of property held for productive use ... or for investment if such property is exchanged solely for property

---

[1] As did the parties, we refer to Exelon, its predecessors and subsidiaries collectively as "Exelon."

of like-kind which is to be held either for productive use ... or for investment." 26 U.S.C. § 1031(a)(1) (1999).

Exelon identified two of its own fossil-fuel power plants that were good candidates for like-kind exchanges: the Collins Plant, to be sold for $930 million, $823 million of which would be taxable gain; and the Powerton Plant, to be sold for $870 million, $683 million of which would be taxable gain. It then identified three investment candidates for the exchanges: the J.K. Spruce Plant Unit No. 1 ("Spruce"), a coal-fired plant in Texas that would replace the Collins Plant; and two coal-fired plants in Georgia–Plant Robert W. Sherer Units No. One, Two, and Three ("Sherer") and Plant Hal Wansley Units No. One and Two ("Wansley"),–which together would replace the Powerton Plant.

To carry out its purported like-kind exchanges, Exelon entered into six "sale-and-leaseback" transactions. In each of the three representative transactions[2] Exelon leased an out-of-state power plant from a tax-exempt entity for a period longer than the plant's estimated useful life. Exelon then immediately leased the plant back to that entity for a shorter sublease term and provided to the tax-exempt entity a multimillion-dollar accommodation fee for engaging in the transaction, along with a fully-funded purchase option to terminate Exelon's residual interest at the end of the sublease.

Exelon asserted that it had acquired a genuine ownership interest in each of the plants as a result of the transactions, thus qualifying them as like-kind exchanges under § 1031,

---

[2] The parties agreed to try three representative test transactions, Spruce, Scherer One and Wansley One, in the tax court and to apply the court's ruling to the remaining transactions.

entitling it to defer tax on the $1,231,927,407 gain it realized from the sale of its power plants. Exelon also claimed $93,641,195 in deductions on its 2001 return for depreciation, interest and transaction costs as lessor of the plants.

The Commissioner disallowed the benefits claimed by Exelon, characterizing the sale-and-leaseback transactions as a variant of the traditional sale-in-lease-out ("SILO") tax shelter that the tax courts and courts of appeals had almost universally invalidated as abusive tax shelters that fail to transfer genuine ownership or leasehold interest in the underlying property. *See, e.g., Wells Fargo & Co. v. United States*, 641 F.3d 1319, 1321-22, 1329-30 (Fed. Cir. 2011). The Commissioner determined income deficiencies of $431,174,592 for tax year 1999 and $5,534,611 for tax year 2001, and imposed a 20% accuracy-related penalty for each year.

After a 13-day trial, the tax court, in a comprehensive 175-page opinion, agreed with the Commissioner, applying the substance over form doctrine to conclude that the transactions in question, like SILO transactions, failed to transfer to Exelon a genuine ownership interest in the out-of-state plants. As a result, Exelon was not entitled to like-kind exchange treatment or its claimed deductions. The tax court agreed with the Commissioner that in substance Exelon's transactions most closely resemble loans from Exelon to the tax-exempt entities.

## II.

### A.    SILOs

Each of Exelon's sale-and-leaseback transactions was structured as a variant of a SILO tax shelter, which is a transaction designed to transfer tax benefits associated with property ownership from a tax-exempt entity to the taxpayer, but which in reality fails to transfer the benefits and burdens of ownership in the underlying property. *See Wells Fargo*, 641 F.3d at 1321. All SILOs are structured similarly.  First, the tax-exempt entity leases the asset to the taxpayer under a "head-lease" for a term that exceeds the useful life of the asset, thereby qualifying the lease as a "sale" for federal tax purposes. The taxpayer concurrently leases the asset back to the tax-exempt entity for a term that is less that the asset's useful life. That lease, called a "sublease," is a "net" lease, meaning that the tax-exempt entity is responsible for all expenses normally associated with ownership of the asset, and retains legal title. *Id*. Each "sublease" contains an option under which the tax-exempt entity can repurchase the asset at the end of the sublease term at a set price. This option is "fully funded" with funds provided by the taxpayer for that purpose at the outset of the transaction. As a result, the tax-exempt entity has no risk of losing control of the asset. *Id*.

The taxpayer prepays its entire "rent" under the headlease in one lump sum payment at closing. *Id*. Typically, this rent prepayment is funded in part with the taxpayer's own funds and in part with a nonrecourse loan, although in some instances (as in the instant case) the taxpayer funds the entire prepayment with its own funds. Most of the taxpayer's prepaid rent is deposited into restricted accounts that are nominally held by the tax-exempt entity but are pledged to secure

the tax-exempt entity's rental obligations under the sublease and to fund its repurchase option at the end of the sublease term.  A small percentage of the headlease rent prepayment, usually between 4% and 8% of the asset value, is paid to the tax-exempt entity as its accommodation fee for participating in the SILO transaction. *Id*.

The taxpayers' headlease prepayment is invested in high grade debt with the growth of the account managed to ensure that the tax-exempt entity has sufficient funds to repurchase the asset from the taxpayer at the conclusion of the sublease without adding any funds of its own.  The repurchase or "exercise price" is set at the beginning of the SILO transaction and can be exercised simply by giving notice. *Id*.

In the unlikely event that the tax-exempt entity chooses not to exercise its repurchase option, the transaction generally provides the taxpayer with two options. First, it can elect a "return option" under which it takes immediate control of the asset or, more likely, it can exercise what is called the "service contract option" under which the tax-exempt entity is required to satisfy several conditions before continuing to use the asset or arranging for its use by a third party. *Id*.

A SILO transaction offers three forms of tax benefits to the taxpayer. First, it can take depreciation deductions on the asset for the remainder of its useful life. Next, it can take deductions for interest payments made from any loan used to finance the taxpayer's prepayment of rent under the headlease. And third, it can deduct certain transaction costs associated with the SILO. These benefits are partially offset by the taxpayer's receipt of income at the end of the sublease if the tax-exempt entity exercises its repurchase option, but "the

deferral of tax payments during the life of the sublease has substantial economic value to the taxpayer." *Id*.

### B. Exelon's Test Transactions

As noted, it was PwC that first pitched the idea of like-kind exchanges to Exelon. PwC's strategy was to use the cash obtained from Exelon's sale of its fossil fuel power plants to acquire "tax title" in like-kind replacement properties through the sale and leaseback transactions, in which the properties would be leased back to the original owner under "triple net" leases with an end-of-term "fixed purchase option." PwC's plan was to structure the transactions to ensure that federal tax ownership of the replacement asset would pass to Exelon, while operation risks remained with the lessee. As incentive to enter the transaction, Exelon would pass a portion of its tax-deferred benefit to the lessee in the form of an upfront cash benefit.

PwC estimated that the tax deferral allowed under § 1031 would provide an after-tax yield of 20%. PwC explained to Exelon that the transactions would be similar to maintaining a typical debt private placement, and that the fundamental risks for Exelon would be the credit of the lessee and the federal tax risk that the IRS would not respect the form of the transaction. PwC explained that the credit risk would be addressed through the transactions' "defeasance strategy," and the tax risk would be mitigated by obtaining an appraisal and other expert opinions to support the conclusion that the fixed purchase option was not "practically compelled." Prior to making its pitch to Exelon, PwC had assisted other clients to implement SILO transactions, including as part of its "Like-Kind Exchange Program."

Once it decided to employ PwC's strategy, Exelon began to put its own team together. Although it had internal tax, treasury and accounting staff, it had no in-house expertise with like-kind exchanges. It retained PwC as its lead financial advisor, and Winston & Strawn, LLP ("Winston") as legal counsel. It also brought in several other experts to provide advice on the transactions, including: Arthur Anderson, LLP, for accounting advice; Sidley Austin, LLP, for regulatory advice; Vincent & Ekins, LLP, and Holland & Knight, LLP, for advice about the new States in which it was investing; as well as top investment and insurance advisors.

After identifying the two of its own plants to be used as part of the exchanges and the new plants to be "purchased," Exelon engaged the engineering firm Stone & Webster Management Consultant, Inc. ("Stone & Webster") to evaluate the new plants to assure itself that it was investing in high quality, well-maintained plants. After receiving confirmation of that from Stone & Webster, the final step was to obtain the valuations and appraisals that Winston would need to provide its expert opinion on whether the transactions would qualify for like-kind exchange tax treatment. Exelon hired Deloitte & Touche, LLP ("Deloitte") to provide the needed appraisals as to the useful life of the assets to be purchased, the value of the assets at the time of the headlease and at the end of the sublease, as well as the financial implications of the transactions' terms and conditions.

### 1.   The Spruce Transaction

On June 2, 2000, Exelon entered into a transaction with City Public Service ("CPS") in San Antonio under which Exelon leased the Spruce Plant for 65 years (the headlease) and simultaneously leased it back to CPS for 32 years (the

sublease). The headlease term exceeded the estimated useful life of the plant by 13 years. At the end of the sublease CPS could exercise a unilateral purchase option to terminate Exelon's residual interest. At closing, Exelon prepaid its entire rent under the headlease, $725 million, using the proceeds from the sale of its fossil fuel plants. The $725 million matched Deloitte's appraisal of the plant's fair market value as of the closing. CPS was required to prepay its entire sublease rent six months later, in the amount of $557,329,539. At the end of the sublease term, CPS had the option to "purchase the plant for $733,849,606."

CPS received $87,318,469 as its "accommodation fee" for entering the transaction. The rest of Exelon's headlease rent prepayment was set aside to secure CPS's rent obligations under the sublease and to fund the purchase option. Thus, at closing, CPS was required to transfer $539,328,241 of the headlease proceeds into collateral accounts for the purchase of government securities that would accrete to cover CPS's obligation to prepay the entire sublease rent six months later. CPS had no control over those accounts, and also had to pay an irrevocable "undertaking fee" of $88,995,790 to AIG Financial Products (Jersey) Ltd., in exchange for which AIG became unconditionally obligated to pay Exelon sums matching both in timing and amount the sum CPS would owe upon exercising its purchase option at the end of the sublease. AIG's payment obligation was guaranteed by American International Group, Inc., backed by a letter of credit issued by AIG Financial Products Corp., and secured by the undertaking fee proceeds, which were pledged to Exelon as collateral during the sublease term.

If CPS were to default, resulting in an early termination of the sublease, Exelon could require CPS to pay as damages a predetermined "stipulated loss value" designed to recover Exelon's full investment plus a premium. Upon receipt of payment, Exelon would transfer its interest in the plant back to CPS with any unaccrued rent paid by CPS. CPS's payment of the stipulated loss value was secured by the undertaking fee proceeds, backed by both the AIG guarantee and the letter of credit. The letter of credit and a separate insurance policy further guaranteed full reimbursement to Exelon in the unlikely event that CPS's payment of the stipulated loss value was voided under bankruptcy law.

Under the sublease, CPS had the right to uninterrupted "use, enjoyment and possession," of the plant, just as before the transaction. Because the sublease was a "net lease," CPS was responsible for all costs and expenses associated with the "ownership, use, possession, control, operation, maintenance, repair, insurance, [and] improvement" of the plant. It also bore the risk of loss, damage, or condemnation of the plant, and any risk of eminent domain, just as it had before the transaction. Exelon's rights were limited to inspecting the plant once a year, and its consent was required for any improvement that "would materially diminish" the plant's value or "adversely affect" its operation.

At the end of the sublease, CPS could exercise its fully-funded purchase option to terminate Exelon's residual interest and reacquire the plant. If CPS did not exercise its option, Exelon would have three choices. First, it could require CPS to arrange for a "qualified operator" to enter into an operating agreement with Exelon. Second, it could require CPS to arrange for a "qualified bidder" to enter into a service

agreement. Finally, Exelon could elect to simply take possession of the plant and operate it. Failure to provide written notice to CPS of which option Exelon elected would result in an election of both the operating agreement and service agreement options.

Under the operating agreement option, CPS was required to find a suitable operator (not CPS) for the plant. The qualified operator must have its senior-long-term debt rated no lower than Aa2 by Moody's and AA by Standard & Poor's ("S&P"), have a comparable rating by another rating agency acceptable to Exelon, or obtain a guarantee of its obligation by anyone meeting the senior long-term debt standard. Deloitte included in its appraisal a list of potential qualified operators. The only one with an acceptable credit rating was General Electric Corp., meaning any other operator would have to make guarantee arrangements.

Under the service agreement option, CPS was required to arrange for the submission of one or more bids from qualified bidders to enter into a "power toll processing agreement" with Exelon in the form attached to the sublease agreement. CPS was also required to arrange for the bidder to satisfy certain conditions precedent to entering into the power toll agreement on or before the expiration date of the sublease. As in the operating agreement, any qualified bidder must have its senior-long-term debt rated no lower than Aa2 by Moody's and AA by S&P, or have its obligations guaranteed by any person that had senior unsecured long-term debt obligations rated no lower than Aa2 by Moody's or AA by S&P. Exelon had sole discretion to accept a bidder that could not satisfy the credit warranty requirement.

The power purchase bids would have to provide Exelon with net power revenue in the amounts and times set forth in the sublease. Exelon could reject any bid if it concluded that the bid would result in the plant being operated inconsistently with the standards, practices, and policies of operators of similar facilities. If CPS were unable to find a successful bidder, or if Exelon were to reject all bidders before the sublease expiration dates, CPS would be required to exercise its purchase option.

In addition, if CPS did not elect to exercise its purchase option it would have to meet certain return conditions for the plant, including minimal operational standards for "Estimated Annual Capacity," "Net Energy Output" and "Efficiency," or else pay Exelon damages equal to the "diminution in fair market value" of the plant.

## 2.        The Scherer and Wansley Transactions

To complete the like-kind exchange for its Powerton plant, on June 9, 2000, Exelon entered into a series of lease agreements with the Municipal Electric Authority of Georgia ("MEAG"), the municipal utility that owned the interests in the Scherer and Wansley plants. The transactions largely mirrored the Spruce transaction, although Exelon purchased interests in rather than the entirety of the plants (31.29% of Scherer and 15.1% of Wansley). Because the two transactions were identical in structure, we describe only the Scherer transaction.

Exelon first leased its interest in the Scherer plant for 61.75 years (longer than the estimated useful life) and simultaneously leased it back to MEAG until 2030 (30.25 years), at which time MEAG can exercise a fully funded unilateral

purchase option. Exelon prepaid at closing its entire rent under the headlease, $201,986,755, using proceeds from the sale of its fossil fuel plants. As in the Spruce transaction, MEAG was required to prepay its entire rent under the sublease six months later, on December 7, 2000, in the amount of $157,414,216. The sublease specified a fixed purchase option price of $179,284,424. Should MEAG default, Exelon could require it to pay as damages a predetermined "stipulated loss value" designed to recover Exelon's full investment, plus a premium. Upon that payment, Exelon would transfer its interest in the plant back to MEAG along with any unaccrued rent paid by MEAG.

As in the Spruce transaction, at closing MEAG was required to set aside most of the headlease prepaid rent to secure its rent obligations and purchase option under the sublease. To effect that requirement, MEAG transferred $152,228,894 of the headlease proceeds to a collateral account for the purchase of government securities that would accrete to cover MEAG's rent obligations due six months later. MEAG was also required to invest $47,576,143 of the headlease proceeds as collateral for its payment of the purchase option price at the end of the sublease. A percentage of this amount represented MEAG's accommodation fee, which MEAG pledged until 2014 to lower the costs of certain credit enhancements that Exelon required to guarantee MEAG's sublease obligations.

To supply that guarantee, MEAG entered back-to-back credit swaps with Ambac Credit Products, LLC, under which Ambac agreed to pay Exelon the difference if MEAG failed to pay the full amount of the stipulated loss value or the purchase option price when required. In return, Exelon would

convey its interests in Scherer to Ambac. Ambac further agreed to fully reimburse Exelon if any payment by MEAG was voided under bankruptcy law. In the second swap, MEAG agreed to pay Ambac the identical amounts for which Ambac was obligated under the first swap, in return for which Ambac would convey the interest in Scherer back to MEAG. MEAG's obligations under the second swap were secured by its pledge to Ambac of the collateral accounts holding the headlease proceeds.

As before the transaction, MEAG retained the right to uninterrupted "use, operation, and possession" of the Scherer plant. And, because the sublease was a "net lease" MEAG also remained solely responsible for all costs and expenses associated with the "ownership, use, possession, control, operation, maintenance, repair, insurance, [and] improvement of the plant," and bore the risk of any loss, damage, or condemnation of the plant. Exelon was not responsible for any costs related to the plant and, as in the Spruce transaction, had rights limited to inspection once a year. In addition, its consent was required for certain assignments by MEAG of its rights under the sublease.

At the end of the sublease, MEAG could exercise its fully funded option to purchase back the interest in the plant. As in the Spruce transaction, if MEAG did not exercise its option, Exelon could impose an operating agreement and a service agreement requiring MEAG to find a "qualified operator" for the plant, and a "qualified bidder" to purchase the power generated by the plant for a predetermined price over the next 8.69 years. Again, as in the Spruce transaction, if MEAG did not exercise its purchase option, it had to meet certain "return" conditions for the plant, including minimum

operational standards for "Estimated Annual Capacity," "Net Energy Output," and "Efficiency," or it had to pay Exelon damages equal to the "diminution in fair market sales value" of the plant caused by MEAG's failure to meet those conditions.

### III.

The tax court held a 13-day trial, hearing testimony from 16 fact witnesses and 10 expert witnesses. Applying the substance-over-form doctrine, the court held that Exelon failed to acquire a genuine ownership interest in the plants and, therefore, was not entitled to like-kind-exchange treatment under § 1031, or to its claimed tax deductions for 2001.

To reach this conclusion, the court first analyzed the parties' rights and obligations during the sublease term for each transaction. In doing so, it concluded that Exelon "did not face any significant risks indicative of genuine ownership" during that period. In particular, the court found that the transactions' "circular flow of money" precluded Exelon from having any real investment in the plants, despite using its own funds (as opposed to borrowed funds in a traditional SILO) to finance the headlease payments. In addition, the court found that each sublease allocated all costs and risks associated with the plants to the sublessees, and that each transaction's defeasance structure left Exelon able to "fully recover its investment" in the unlikely event of either a lessee bankruptcy or an early termination of the sublease.

Next, the court reviewed the parties' options at the end of the sublease terms and found that there was a "reasonable likelihood" that the lessees would each exercise its purchase option, meaning Exelon's profit was fixed at the onset of each transaction, and thus Exelon did not acquire any benefits or

burdens of ownership. The court rejected Exelon's reliance on the properties' residual values to establish genuine owner-ship. In particular, the court, agreeing with the government's expert, found that Deloitte's appraisals of the future fair mar-ket value of the plants at the end of the sublease terms were too low. As a result, it rejected Exelon's argument that the sublessees were not "economically compelled" to exercise the purchase option.

The court also found that Winston had interfered with the "integrity and independence" of the appraisal process by "providing Deloitte with the wording of the conclusions it ex-pected to see in the final appraisal reports." Finally, the court found that Deloitte had failed to consider the costs to the sub-lessees of not exercising their purchase options. In this regard, after analyzing the subleases' return-condition requirements, the court found that the parties all "understood and reasona-bly expected" that the sublessees would exercise their pur-chase options, because meeting the return conditions would be "extremely burdensome," "if not impossible."

The court then sustained the imposition of accuracy re-lated penalties for both 1999 and 2001 based on negligence or disregard of rules and regulations, rejecting Exelon's "reason-able cause" defense based on its reliance on Winston's tax ad-vice. The court concluded that Exelon could not have relied on Winston's tax opinions "in good faith because [Exelon], with its expertise and sophistication, knew or should have known that the conclusions in the tax opinions were incon-sistent with the terms of the deal."

On appeal Exelon argues that the tax court: (1) used the wrong legal standard to determine whether the purchase op-tions were so likely to be exercised as to render both the

options and Exelon's ownership illusory; (2) wrongly dismissed Exelon's reliance on its advisors' opinions based on communications between Winston and Deloitte that Exelon asserts were not improper, let alone so improper that Exelon should have known that they undermined Deloitte's appraisals; and (3) misunderstood the subleases' return conditions in concluding that compliance with those conditions would be unduly costly. We review the tax court's legal conclusions de novo and its findings of fact for clear error. *Freda v. Comm'r*, 656 F.3d 570, 573 (7th Cir. 2011).

## IV.

Taxpayers, of course, have the right to decrease the amount of what otherwise would be owed in taxes, or even avoid them altogether, by any lawful means. *See BB&T Corp. v. United States*, 523 F.3d 461, 471 (4th Cir. 2008). "Anyone may so arrange his affairs that his taxes shall be as low as possible; he is not bound to choose that pattern which will best pay the Treasury... ." *Helvering v. Gregory*, 69 F.2d. 809, 810 (2d Cir. 1934) (L. Hand, J.), aff'd, 293 U.S. 465 (1935).

Taxpayers cannot, however, claim tax benefits not conferred by Congress by setting up sham transactions that lack any legitimate business purpose or by affixing labels that do not accurately reflect the transactions' true nature. *BB&T Corp.*, 523 F.3d at 471. As a result, judicial anti-abuse doctrines have developed to "prevent taxpayers from subverting the legislative purpose of the tax code." *Coltec Indus., Inc. v. United States*, 454 F.3d 1340, 1353 (Fed. Cir. 2006). One such doctrine, the substance-over-form doctrine applied by the tax court, "provides that the tax consequences of a transaction are determined based on the underlying substance of the transaction rather than its legal form." *Wells Fargo*, 641 F.3d at 1325.

In applying this doctrine, the Supreme Court has "looked to the objective economic realities of a transaction rather than the particular form the parties employed," and "has never regarded the simple expedient of drawing up papers as controlling for tax purposes when the objective economic realities are to the contrary." *Frank Lyon Co. v. United States*, 435 U.S. 561, 573 (1978) (internal quotations omitted).

Section 1031 of the Internal Revenue Code, 26 U.S.C. § 1031(a)(1) (1999), provides a narrow exception to the general rule that taxpayers are required to recognize all gains from the sale or exchange of property in the year of realization:

> No gain or loss shall be recognized on the exchange of property held for productive use in a trade or business or for investment if such property is exchanged solely for property of like kind which is to be held either for productive use in a trade or business or for investment.

This section "was designed to avoid the imposition of a tax on those who do not 'cash in' on their investments in trade or business property." *Starker v. United States*, 602 F.2d 1341, 1352 (9th Cir. 1979). The underlying assumption of this exception "is that the new property is substantially a continuation of the old investment still unliquidated ... ." 26 C.F.R. § 1.1002-1(c). To constitute an exchange, the transaction "must be a reciprocal transfer of property, as distinguished from a transfer of property for a money consideration only." 26 C.F.R. § 11002-1(d).

In the instant case, the tax court concluded that there was no "exchange" of like-kind property in any of the transactions because Exelon never acquired genuine ownership (or

ownership interests) in any of the replacement plants. Exelon first objects that the tax court equated the transactions to typical SILO transactions such as those in *Wells Fargo*, which involved "sham" transactions that were driven exclusively by the taxpayer's effort to claim special tax benefits associated with leasing the property back to a tax-exempt entity. In contrast, Exelon argues that its transactions were "driven by business considerations and tax advantages deriving principally from the like-kind exchange provisions of the code."

This argument is more properly directed to the "economic substance doctrine," which the tax court did not apply. We note, however, that each transaction that Exelon entered was in fact with a tax-exempt entity, and Exelon attempted to claim those special tax deductions that were at the heart of the SILO cases.

In any event, the tax court's reliance on the SILO/LILO cases such as *Consolidated Edison Co. of New York, Inc. v. United States*, 703 F.3d 1367 (Fed. Cir. 2013), *John Hancock Life Insurance Co. (U.S.A.) v. Commissioner*, 141 T.C. 1 (2013), and *Wells Fargo*, was for their methodology and analysis as to whether the taxpayer had acquired the benefits and burdens of ownership which, even assuming Exelon's legitimate purpose to avail itself of the tax benefits that Congress conferred in § 1031, is the key issue in this case. To be entitled to the § 1031 exception, Exelon had to acquire a genuine ownership interest in the replacement plants. Ownership for tax purposes is not determined by legal title. "[T]o qualify as an `owner' for tax purposes, the taxpayer must bear the benefits and burdens of property ownership." *Wells Fargo*, 641 F.3d at 1325 (*citing Frank Lyon*, 435 U.S. at 572–73).

Because the subleases were "net leases," they allocated all of the costs and risks associated with the plants to the sublessees. That, along with each transaction's defeasance structure and the circular flow of money, leads to the inescapable conclusion that Exelon did not face any significant risk indicative of genuine ownership during the terms of the subleases, as the tax court found. Exelon's argument that it faced "real risks" of having to return any unaccrued rent in the event of a sublessee bankruptcy is unconvincing. Prior to entering the transactions Exelon was assured and satisfied that CPS could not declare bankruptcy until and unless the City of San Antonio declared bankruptcy, and MEAG was prevented by Georgia law from declaring bankruptcy.

Unable to seriously dispute this conclusion, Exelon focuses more on what could happen at the end of the sublease terms, arguing that it faced the "very real risk" that the sublessees might not exercise the purchase options, leaving Exelon as owner of the plants. It is here that the tax court erred, according to Exelon, by applying the wrong legal standard. The tax court, relying on its opinion in *John Hancock,* which adopted the standard set forth in *Wells Fargo*, applied a "reasonable likelihood" test, concluding that each sublessee was reasonably likely to exercise the purchase option. Exelon argues that the court should have asked whether the lessees would be "economically compelled" to exercise the options. This, according to Exelon was the "extant law" at the time of the transaction.

It is unclear to us from where this "extant" law comes, for none of the cases cited by Exelon actually hold that this is the proper standard. Certainly, our opinion in *M&W Gear Co. v. Commissioner*, 446 F.2d 841 (7th Cir. 1971), the case on which

it primarily relies, does not adopt this standard. In *M&W Gear Co.*, the taxpayer sought to buy farm land on which to test its new farm implements. It negotiated to purchase Blairsville Farm for $335,250 plus some farm equipment for $37,000. Instead of a purchase agreement, the parties entered into a lease with an option to purchase. Under the agreement, the taxpayer paid annual rent of $50,660 and had an option to purchase at the termination of the lease for $173,707.40. The taxpayer deducted its annual rental payments, but the Commissioner and the tax court disallowed the deductions, concluding that they "did not constitute rental payments but partial payments on the purchase price of the land." This court affirmed that holding because the evidence supported the tax court's finding that the taxpayer intended to acquire an equity interest in the farm. In particular, we noted that the option price was considerably less than the fair market value of the farm. We did note that the taxpayer was under no legal obligation to exercise the option and stated, *id*. at 846:

> In addition, we are impressed with what appears to be the [taxpayer's] economic obligation to buy the Blairsville Farm. Not only did the [taxpayer] purchase $37,000 worth of farm machinery upon the execution of the lease, but it paid ... over $100,000 in 1963 and 1964 for ditching and draining of the farm property. Numerous other expenditures were made for 'leasehold improvements' that included water tanks, sheds, culverts, floodgates, and water lifts. The latter are not recoverable expenditures to a lessee, and, in our opinion, are inconsistent with a claim by the [taxpayer] that prior to the exercise

of the option to purchase it had not intended to
acquire an equity in the farm.

Our use of the phrase "economic obligation" referred
more to the position in which the taxpayer had placed itself
than to any term of the lease agreement. It certainly did not in
any way adopt an "economic compulsion" standard to be ap-
plied to determine the likelihood of a lessee exercising a pur-
chase option.

The best that can be said for Exelon's position is that some
courts have found, based on the particular facts of the case,
that it was "highly likely" and "nearly certain" that the pur-
chase option would be exercised. *See AWG Leasing Trust v.
United States*, 592 F. Supp. 2d 953, 985 (N.D. Ohio 2008). But
making that factual finding, and even affirming such a find-
ing, is a far cry from adopting a standard. For example, *Wells
Fargo* applied a reasonable likelihood standard even in affirm-
ing the district court's finding that the purchase options were
"virtually certain" to be exercised. Indeed, every circuit court
that has considered the issue has adopted some form of rea-
sonable likelihood standard. *See Wells Fargo*, 641 F.3d at 1325–
26 (Fed. Cir. 2011); *Altria Group, Inc. v. United States*, 658 F.3d
276, 287 (2d Cir. 2011) (rejecting a "certain or virtually certain"
to be exercised test in favor of a likelihood test); *Consol. Edison*,
703 F.3d at 1376–77 (Fed. Cir. 2013) (applying a reasonable ex-
pectation standard). We agree with these courts and hold that
a "reasonable expectation or likelihood" standard rather than
an economic compulsion or certainty standard governs the
characterization of a tax transaction under the substance-
over-form doctrine.

Exelon next argues that the tax court clearly erred in its
application of the reasonably likely standard. It first takes

issue with the court's rejection of Deloitte's conclusions that for each sublease the price to exercise the purchase option would be considerably higher than the fair market value of the property at the end of the leases. For example, according to Deloitte's appraisal, the fair market value of the Spruce Plant at the end of the sublease was expected to be approximately $626 million, while the purchase option price was set at $733,849,606. Exelon argues that no reasonable person would overpay over $100 million for an asset it could easily replace.

We find two fallacies with Exelon's position. First, the tax court rejected Deloitte's methodology in determining the fair market value at the end of the sublease, agreeing with the government's expert, Dr. Skinner, that there were several flaws in Deloitte's appraisal, including using a 9% state corporate income tax rate when Texas does not impose a state corporate income tax, and using too high of a discount rate. After correcting for those flaws, Dr. Skinner computed fair market values substantially higher than the fixed purchase option prices, and concluded that it would be "nearly certain" that the lessees would exercise their respective options. The tax court was well within its bounds as finder of fact to accept Dr. Skinner's testimony and conclusions over those of Deloitte's. Certainly, it committed no clear error in doing so.

The tax court also rejected Deloitte's appraisals because it found that Winston had interfered with the integrity and independence of the appraisal process by providing Deloitte with the wording of the conclusions it expected to see in the final appraisal reports. As did the tax court, we reject Exelon's argument that Winston was merely providing the existing guidance and tests on the issue of what is considered to be a

lease. Winston's December 29, 1999, letter to Deloitte contained a detailed list of specific conclusions that Winston needed in order to issue the necessary tax opinion. Deloitte's conclusions mirrored those in Winston's letter almost word for word. The evidence certainly supports the tax court's decision to reject Deloitte's appraisals.

As noted, there is a second, more fundamental problem with Exelon's position that the set purchase option prices far exceeded the fair market value of the plants at the end of the subleases. Even if we were to accept that position, it does not lead to Exelon's conclusion that "no reasonable person would overpay" that much. To be sure, no reasonable entity would overpay if it was paying with its own money. But here, the sublessees could exercise the purchase options without paying a single cent of their own money. Thus, Exelon's argument does not reflect the economic reality of the transactions. "Because the `purchase' is free to [the sublessees], price cannot be [an] obstacle." *BB&T Corp.*, 523 F.3d at 473 n.13. And, because the sublessees do not retain any of the money set aside for the purchase option if they do not exercise it, they have no economic incentive not to do so. Indeed, exercising the options leaves the sublessees in precisely the same position as if they had not entered the transactions, except millions of dollars richer.

Exelon's final argument is that the tax court clearly erred in its understanding of the end-of-lease physical return conditions and thus in its application of the reasonably likely standard. According to Exelon, joined by the amicus, the court confused the terms "availability factor" with "capacity factor."

A plant's "availability factor" is the number of hours in a given period (one year) that the plant could theoretically run. Thus, availability is the total number of hours in the period minus the hours that the plant is down for maintenance (planned or unplanned) or for any other reason. Availability can be controlled, for the most part, by the plant operator.

"Capacity factor," on the other hand, refers to the number of hours a plant is actually run in the given period (one year). A plant's capacity factor is affected by its availability and by other factors such as demand, over which the plant operator has much less control.

Stone and Webster's engineering reports included historical performance data for each plant's "Capacity Factor," "Equivalent Availability," and "Heat Rate," defined as:

> **Capacity Factor**–The ratio of the actual net generation to the normal claimed capacity operating for 8760 hours/year.

> **Equivalent Availability** (EAF)–The fraction of maximum generation that could be provided if limited only by outages, overhauls, and deratings. It is the ratio of available generation to maximum generation.

> **Heat Rate** (Btu/kWh)–The ratio of the heat energy input to the net unit electric energy output.

Deloitte used Stone and Webster's historical capacity and availability data to estimate each plant's residual value. Using the definitions from the Stone and Webster report, Deloitte estimated each plant's Capacity Factor at the end of the sublease terms as:

Spruce–58.7%

Scherer–39.9%

Wansley–39.2%

Each sublease had a return condition titled "Estimated Annual Capacity," that had the same definition as used in the Stone and Webster report—"an annual ratio of the actual net generation to the normal claimed capacity operating for 8,760 hours/year." The sublease return conditions, however, had much higher capacity factors than the Deloitte estimate of residual value:

Spruce–82%

Scherer–62%

Wansley–62%

This led the tax court to conclude that it would be too costly for the sublessees to get the plants' capacity factors up to that specified in the return conditions, leaving it reasonably likely that they would exercise their purchase options.

Exelon argues that despite its title, the "Estimated Annual Capacity" return condition refers to the plants' availability factors and should not be compared to the capacity factors estimated by Deloitte. Joined by the amicus, Exelon argues that anyone in the industry would recognize this, and that no one in the industry would agree to a return condition based on capacity, which is largely out of the operator's control.

We disagree. Exelon has no explanation for the fact that Deloitte and the subleases used the same definition, except to suggest that in retrospect the drafter (Exelon) should have been more precise with its language. Nor can Exelon get around the fact that the subleases' definition of Estimated

Annual Capacity refers to the annual ratio of the "<u>actual net generation</u> to the normal claimed capacity … ." (emphasis added). The definition refers to actual generation—not the potential generation. It is, as its title suggests, a reference to the plant's capacity factor.

Additionally, each sublease had another return condition titled "Net Energy Output," defined as "an annual ratio of the maximum generation <u>that could have been provided</u> if limited only by outages, overhauls, and derating (the ratio of available generation to maximum generation)" of at least 89% for Spruce and 87.5% for Sherer and Wansley. This return condition quite clearly refers to the plant's availability factor. Thus, if Exelon is correct, each sublease would contain two different irreconcilable return conditions for the availability factor.

As to Exelon's argument that no one in the industry would agree to a return condition based on capacity factor, we note that these are not typical leases. Exelon had a strong incentive to require such a return condition, because it did not want the plants back. Remember, these transactions were the direct result of Exelon's decision to get out of the fossil fuel business.

Additionally, the sublessees were not worried about the return conditions because they always intended to exercise the purchase options. There was never any incentive to not do so. Had they been even remotely concerned, they would have done their own independent appraisal to assess both the value of the plants at the time of the sale and the residual value at the end of the lease terms. Neither chose to do so. Indeed, before proceeding, the City of San Antonio filed a state court action to obtain a declaration of the continued validity of certain covenants in its outstanding public securities,

thereby allowing CPS to enter into the transaction. In its initial draft of that petition, San Antonio represented that it intended to exercise the purchase option. Tellingly, this representation was removed at Winston's and PwC's suggestion.

The record also reveals that MEAG, too, always intended to exercise its option. Its own internal documents describing the transaction indicate: "At the end of the lease term, MEAGPower exercises its purchase option, the money for which has been previously set aside at the beginning of the transaction."

In short, the record definitively reveals that all of the parties to these transactions fully intended and expected the sublessees to exercise their purchase options at the end of the sublease terms. As a result, we agree with the tax court's finding that Exelon bore none of the burdens or indicia of ownership such that it was entitled to the benefit of a §1031 like-kind exchange.

## V.

Section 6662 of the Tax Code imposes a mandatory 20 percent penalty on the portion of any underpayment of tax that is attributable to "[n]egligence or disregard of rules or regulations." 26 U.S.C. § 6662(a), (b)(1). For purposes of this section, the term negligence "includes any failure to make a reasonable attempt to comply with the provisions" of the Code, and the term disregard "includes any careless, reckless, or intentional disregard." 26 U.S.C. § 6662(c). Negligence is "strongly indicated" when the taxpayer fails to make a reasonable inquiry into the correctness of an item that appears "too good to be true." Treas. Reg. § 1.6662-3(b)(1)(ii).

Not every tax underpayment is subject to § 6662 penalties. A taxpayer who had "a reasonable cause" for the underpayment and acted in "good faith" with respect to that portion of the underpayment has a valid defense. 26 U.S.C. § 6664(c)(1). "Whether a taxpayer had reasonable cause depends on all of the pertinent facts and circumstances of a particular case, with the most important factor being the taxpayer's effort to assess his proper tax liability." *American Boat Co., LLC v. United States*, 583 F.3d 471, 481 (7th Cir. 2009) (*citing* Treas. Reg. § 1.6664-4(b)(1)).

One common method of demonstrating reasonable cause is to show reliance on the advice of a competent and independent professional advisor. *American Boat*, 583 F.3d at 481 (*citing United States v. Boyle*, 469 U.S. 241, 251 (1985) ("When an accountant or attorney advises a taxpayer on a matter of tax law, such as whether a liability exists, it is reasonable for the tax-payer to rely on that advice.")).

Simply relying on a professional does not necessarily relieve a taxpayer of penalties. "To constitute reasonable cause, the reliance must have been reasonable in light of the circumstances. This is a fact-specific determination with many variables, but the question turns on the quality and objectivity of the professional advice obtained." *Id*. (internal quotations and citations omitted). To establish the defense the taxpayer, at a minimum, must show that the advice was "(1) based on all relevant facts and circumstances, meaning the taxpayer must not withhold pertinent information[;] and (2) not based on unreasonable factual or legal assumptions, including those the taxpayer knows or has reason to know are untrue." *Id*. The taxpayer's education, sophistication, business experience,

and purpose for entering the questioned transaction are also relevant factors to be considered. *Id*.

In the instant case, the tax court sustained the Commissioner's imposition of penalties based on its findings that the underpayments for those years were attributable to Exelon's negligence or disregard of rules or regulations. In doing so, the court necessarily rejected Exelon's "reasonable cause" defense of reliance on its professional advisors. In particular, the court found that Exelon did not rely in good faith on Winston's tax opinions because Exelon "knew or should have known" that Winston's conclusions were flawed in light of the "obvious inconsistency" of the physical return condition specified in the contracts and the capacity factors projected by Deloitte for the plants at the end of the subleases, which made exercise of the purchase options more likely. The tax court found that Exelon must have appreciated that it would be very expensive for the sublessees to sufficiently upgrade the plants to meet the return capacity requirements. Thus, the court concluded that Exelon must have understood that Winston's tax opinions, based on the Deloitte appraisals, were flawed.

Exelon's attack on this finding mimics its argument that the tax court confused capacity factor with availability factor and thus compared apples to oranges in its determination that the sublessees were reasonably likely to exercise their purchase options. We rejected that argument above and we reject it again here. We agree with the tax court that as a sophisticated plant operator, Exelon knew or should have known that, given the way these transactions were structured and given what the tax court found to be tainted appraisals, it was

reasonably likely, or even highly likely, that the sublessees would exercise their options.

Exelon continues to argue that the Deloitte appraisals were not tainted by Winston's input. More importantly, it argues that even if the appraisals were tainted, Exelon had no way of knowing that and cannot be penalized for its reliance on Winston's opinions. The record is replete, however, with evidence that Exelon knew full well that Winston was supplying Deloitte with the necessary conclusions. Both Walter Hahn and Robert Hanley of Exelon were copied on the emails sent by Winston first to Stone and Webster and then to Deloitte. Indeed, it was Hahn who concluded that most of the requested conclusions were items for Deloitte, and sent the list of Winston's necessary appraisal conclusions to Deloitte multiple times.

Whether reasonable cause exists, and the finding underlying that determination, are questions of fact which we review for clear error. *American Boat*, 583 F.3d at 483. We find no such error and affirm the tax court's conclusion that penalties are warranted under § 6662.

AFFIRMED.